James Douglas DUNHAM *v.* Mike DOYLE and Stephanie Doyle

CA 02-515                                            129 S.W.3d 304

Court of Appeals of Arkansas
Division III
Opinion delivered November 19, 2003

[Petition for rehearing denied January 7, 2004.]

---

*Matthews, Campbell, Rhoads, McClure, Thompson, & Fryauf, P.A.*, by: *Edwin N. McClure*, for appellant.

*Brenda Austin, Ltd.*, by: *Brenda Horn Austin*, for appellee.

JOHN B. ROBBINS, Judge. James Dunham appeals the order of the Washington County Circuit Court that changed custody of his two children, Jacob and Lexie, from a joint-custody arrangement between him and his ex-wife Kathleen to the children's maternal grandparents, appellees Michael and Stephanie Doyle. We reverse and remand.

Kathleen and James divorced pursuant to an order filed on September 7, 2000, which granted joint custody to the parents. James was ordered to have custody of the children during the week, and Kathleen during the weekend, Friday evening until Sunday evening, though required to be supervised by her parents. All parties resided in Fayetteville at the time; Kathleen resided with her parents, and James resided in the marital home, which was to be sold or auctioned under the terms of the divorce decree unless the parties could agree otherwise. At the time of the divorce, their son Jacob was attending kindergarten in Fayetteville, and their daughter Lexie, age two, was attending daycare at My Other Mother in Fayetteville. Jacob was transported to daycare after school was dismissed.

In October 2000, James remarried and moved to a two-bedroom apartment in Rogers with his new wife Desa, her two sons Remington and Magnum, and his two children Jacob and Lexie. In November 2000, Kathleen petitioned the court to change from joint custody to her full custody or, alternatively, to change the custody arrangement so that she could have the children during the week so as to move their son back to his original school. Kathleen worked as a medical assistant in various locations as assigned to her in northwest Arkansas. Kathleen lived with her parents in Fayetteville when the children were with her. Kathleen stayed with her boyfriend Jerry in Rogers when the children were not with her. Pursuant to the divorce decree, Kathleen was under an obligation to prevent any contact between her children and her boyfriend Jerry.

The maternal grandparents petitioned in December 2000 to intervene and to have the court appoint a guardian ad litem. The grandparents' petition requested that they be granted temporary custody, citing the multiple changes since the divorce and focusing on the actions or inactions of James as they affected the children. After hearings on the matter, the trial judge found that there had been a material change of circumstances, that neither parent was fit to have custody, and that vesting custody in the maternal grand-parents was in the best interest of the two children, then age seven and three. Each parent was given visitation, and Kathleen was required to move out of her parents' home. The order was filed on August 22, 2001. Only James appeals, challenging the change-of-custody order on two bases: (1) that the circuit court clearly erred in finding that the children's best interest would be met by removing them from their parents and placing them with their

grandparents; and (2) that the trial court clearly erred because there is insufficient evidence to show that both parents were unfit. James does not challenge the finding that material changes in circumstances occurred.

The standard of review in child-custody appeals is well settled. We review the evidence de novo, but we will not reverse the findings of the court unless it is shown that they are clearly contrary to the preponderance of the evidence. *Thompson v. Thompson*, 63 Ark. App. 89, 974 S.W.2d 494 (1998). We also give special deference to the superior position of the trial court to evaluate and judge the credibility of the witnesses in child-custody cases. *Hamilton v. Barrett*, 337 Ark. 460, 989 S.W.2d 520 (1999). We know of no cases in which the superior position, ability, and opportunity of the trial court to observe the parties carry as great a weight as those involving children. *Watts v. Watts*, 17 Ark. App. 253, 707 S.W.2d 177 (1986). A finding is clearly against the preponderance of the evidence when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. *Hollinger v. Hollinger*, 65 Ark. App. 110, 986 S.W.2d 105 (1999).

The substantive law on this topic is equally well settled. The law prefers a parent over a grandparent or other third person, unless the parent is proved to be incompetent or unfit. *See, e.g., Schuh v. Roberson*, 302 Ark. 305, 788 S.W.2d 740 (1990); *Stamps v. Rawlins*, 297 Ark. 370, 761 S.W.2d 933 (1988); *Jones v. Strauser*, 266 Ark. 441, 585 S.W.2d 931 (1979); *Payne v. Jones*, 242 Ark. 686, 415 S.W.2d 57 (1967); *Riley v. Vest*, 235 Ark. 192, 357 S.W.2d 497 (1962). While there is a preference in custody cases to award a child to its biological parent, that preference is not absolute. *Freshour v. West*, 334 Ark. 100, 971 S.W.2d 263 (1998). Rather, of prime concern, and the controlling factor, is the best interest of the child. *Id.* The rights of parents are not proprietary and are subject to their related duty to care for and protect the child; the law secures their preferential rights only as long as they discharge their obligations. *Id.; Jones v. Jones*, 13 Ark. App. 102, 680 S.W.2d 118 (1984); *Watkins v. Dudgeon*, 270 Ark. 516, 606 S.W.2d 78 (Ark. App.1980).

We limit our examination of the evidence to that which is most relevant to James inasmuch as Kathleen did not appeal the finding that she is unfit to have custody. The testimony at the

hearings on this case revealed many undisputed facts. In line with the divorce decree, the children lived with their father James in the marital residence prior to and after the divorce, and they lived with their mother Kathleen and maternal grandparents on the weekends. However, while the parties all lived in Fayetteville, Kathleen had additional time with the children when mutually agreeable. Pursuant to the divorce decree, James was given the right to select the school that their children would attend. Also pursuant to the divorce decree, the marital residence was ordered to be sold, and it eventually went to public auction.

At the time of the divorce, and unbeknownst to the circuit judge, James was in a relationship with Desa, whom he met on the Internet in the spring of 2000 and married on October 19, 2000. Desa lived in an apartment in Rogers, and James moved himself and the children to Rogers on or about Sunday, October 29, 2000. This necessitated that the older child, Jacob, change schools. James notified Kathleen of this move in writing by hand-delivering a letter to her on that Sunday at the end of Kathleen's weekend visitation. Jacob started school in Rogers the following Monday. The move, along with other alleged changes including lack of communication between them and inadequate basic care of the children in James's custody, prompted Kathleen's petition to change custody. The Doyles moved to intervene in December 2000, asking for temporary custody.

At the hearing on the petitions conducted on August 1, 2001, James explained that he and Desa decided that they should move as a family to Rogers inasmuch as Kathleen would not agree that James retain the marital home. The move necessitated that Jacob change schools, where he would attend with his step-brother Remington, who was two grades ahead of Jacob. Neither Magnum nor Lexie were school age at that time, so they attended My Other Mother daycare at the facility in Rogers.

Around Thanksgiving 2000, James, Desa, and the children moved to a three-bedroom house on Ash Street in Rogers, leasing the property for one year. The house had a fenced back yard, equipped with a sandbox, swing set, and clubhouse. By the summer of 2001, James and Desa had a son, Colt.[1] James testified that Jacob finished the school year 2000-2001 in Rogers where he

---

[1] James and Desa testified that the boys' names were not associated with guns, but were rather names of television characters.

had begun kindergarten in October, but that they planned to send Jacob and Remington to school in the district assigned to Ash Street beginning in the fall of 2001. James had not decided whether to move from Ash Street after the one-year lease expired, but he said that if they did, they would stay in the same school district as Ash Street.

Kathleen testified that her main concern was the frequency of injury and severity of illness of Jacob and Lexie while in James and Desa's custody. Jacob suffered a sunburn on a weekend camping trip with James and Desa in the late summer 2000. In the months after the divorce, Jacob had at least two black eyes, though one occurred at daycare. In James and Desa's backyard, Jacob had fallen from a tree and struck his head on a low limb, requiring four staples in his head. Lexie suffered a black eye when she and Jacob collided at play, and Lexie had also suffered a broken arm when she fell from a jungle gym in a city park while under James and Desa's care.

James explained the circumstances of those injuries and the timing of his notice to Kathleen about those injuries. James stated that DHS had been notified by someone of those injuries, DHS investigated the complaints, and nothing else ever came of that investigation. James inferred that Kathleen was the person who reported suspected abuse to DHS.

Kathleen also expressed concern about her children changing to another doctor and going to another school, but she agreed that she had not been denied any of her court-ordered visitation due to the move. Kathleen had other complaints. For example, she testified that James was responsible for Jacob being tardy for school on numerous occasions, that he did not ensure that Jacob's clothing or shoes fit, that he would send any uneaten food from one day's packed lunch on the following day for Jacob to eat, that James was slow to take the children to the doctor when they were ill, and that James refused her attempts to care for the children when James was unavailable at work. Basically, Kathleen questioned James's capability of caring for the children in a manner that she deemed best for them and thought she was the better suited parent with more time to attend to their needs.

James and Kathleen both testified that there had been occasional rearrangements with the joint-custody schedule to accommodate different family functions on each side. Both conceded that there was significant discord between them after the

divorce and that they often communicated about the children solely by letter. James and Kathleen disagreed on basic issues such as how to handle Jacob's lunch needs at school; basic discipline measures; types of extracurricular activities in which the children might participate; whether, when, and how to medicate the children; and whether each parent should get consent from the other regarding children's haircuts. James maintained that the anger between them had subsided in the months leading up to the hearings and that some healing had occurred between them. James explained that he was only in court to defend himself, not to seek a change.

The maternal grandparents, appellees Doyle, testified that they supervised the visits between their daughter and their grand-children and that Kathleen was a wonderful mother, devoted to their care and comfort. The Doyles agreed that they provided financial support to their daughter and would continue to do so. Mrs. Doyle testified that the reason they intervened was because of the frequency of injury and illness when James had the children, citing to rashes, sunburns, cuts, black eyes, bumps and bruises. Mrs. Doyle expressed great concern that James and Desa were unable to supervise, whereas Mrs. Doyle had no reservations about her daughter's ability to care for her children. Mrs. Doyle said that if her daughter married her boyfriend Jerry, they possibly could move into the Doyle residence, but that was "a contingency plan" and just "talk" right now. Mrs. Doyle said that her main concern was to provide stability and safety for her grandchildren. She was concerned about changes in Jacob and Lexie after the birth of their half-brother Colt; Jacob expressed unusual aggression, and Lexie regressed to wanting to be more like a baby. Mrs. Doyle's position was that she stood ready to take the children as their permanent guardian if necessary, though she did not agree that her daughter was unstable.

Mr. Doyle testified that the joint-custody situation had never worked. Mr. Doyle said that he and his wife thought they were finished raising children, but if it were necessary to protect the grandchildren, then that is what they would do for as long as it took. Mr. Doyle testified that if his daughter was awarded custody, or if he and his wife were awarded custody, then he would ensure that his house would remain the children's home. He believed that the first school Jacob attended before he moved was one of the best in northwest Arkansas. Mr. Doyle was worried about Jacob's mental health since he began exhibiting aggressive behavior, he

was worried about Jacob's low weight, Jacob's extensive illnesses and injuries in James's care, and his education. Mr. Doyle expressed concern that Lexie exhibited sexually inappropriate knowledge for her age. He offered to pay for counseling for the children, and even for the parents if needed.

Mr. Doyle frankly admitted that his daughter Kathleen was dysfunctional right after the divorce, but he said she had improved dramatically. Mr. Doyle said that he and his wife wanted to give the court an alternative if it determined that neither of the parents could be reliable. He said he was certain that he could follow any orders of the court to preserve the children's relationship with their parents, but he said that his honest opinion was that James was a liar and a cheat who he would like to beat with a bull whip.

Jacob's first kindergarten teacher testified that she recalled Jacob being tardy several times in the first nine weeks of school, that he was thin but not unusually so, that he sometimes had difficulty with ill-fitting shoes but that Kathleen remedied that situation, and that he was a fairly clean child. The teacher remembered more interaction with Kathleen than James, but she recalled James informing her that Jacob was moving on the Friday before he left. She said that the school's policies did not prevent a parent from ensuring their kindergarten child made their way to the classroom in a timely fashion.

Tedra Spaw, the owner of My Other Mother daycare, testified that she had observed the children over time, primarily at the Rogers location. Ms. Spaw stated that the children appeared to be "well-adjusted, normal, every-day children" and were "clean and well-dressed." Nothing about their physical appearance concerned Ms. Spaw, even considering Jacob's weight. Ms. Spaw said she had no concerns about the well-being of the children since they had been at the Rogers facility, and she recognized her duty to report abuse to authorities. She recalled when Jacob blackened his eye at daycare and said that she gave an incident report to one of the parents. Ms. Spaw said that the children were happy to see their father and their step-mother when picked up, but she stated that their mother, who was initially very upset that the children had been moved to Rogers, was disruptive to the facility on more than one occasion.

Ms. Spaw remembered Mr. Doyle coming to the Rogers facility to pay the children's delinquent Fayetteville daycare account, and she said Mr. Doyle called both parents "slime and

unfit." Ms. Spaw said that Desa's sons Remington and Magnum were already attending care at My Other Mother in Rogers prior to Jacob and Lexie joining them there. Ms. Spaw said she would not call Desa's sons particularly rambunctious. Ms. Spaw testified that, to be fair, both James and Kathleen were frustrated and angry after the divorce like most parents, but that James was better able to contain his anger in front of the children, and that they both improved with time.

The children's current pediatrician in Rogers, Dr. Youngblood, testified that he was aware of the children's illnesses and injuries, which he described as typical. He reviewed their illnesses, including strep and ear infections, a rash associated with strep, and lacerations. The doctor said that Jacob was in the 25th percentile in both height and weight for his age, which was normal. He concluded that "they're both basically healthy children." The only concern Dr. Youngblood expressed was that Jacob was reported to have some attention problems in school. In particular, Dr. Youngblood was advised of his teacher's opinion that Jacob lacked focus in class and of reports that when Jacob was dropped off at school, he would wander the halls instead of go to class. However, Dr. Youngblood had not received all the reports to be filled out by various sources, so the evaluation on ADD was incomplete to date.

James and Desa's next door neighbor, Max Cardin, testified on their behalf. James and Desa introduced themselves to Mr. Cardin before they moved into the rent house, and Mr. Cardin said that they seemed to be nice people. Mr. Cardin said that he had been in the neighborhood for many years, that he helped James put up a sturdy swing set, and that he observed a clubhouse and sandbox in the back yard for the children. Mr. Cardin observed the children playing out in the yard and saw nothing that concerned him.

The children's attorney ad litem recommended that custody be placed with the maternal grandparents because they were the most stable force in the children's lives. The ad litem was concerned about the illnesses and injuries suffered by the children in their father's care. The ad litem was likewise concerned about the mother's lack of financial and housing stability and her association with Jerry, who was ordered to have no contact with the children. The ad litem recommended alternating weekend visitation with each · of the parents and assessment of child support as to the parents.

Each attorney presented argument to the trial court as to why their respective positions should be the ruling of the court. James requested that the petitions be denied and that joint custody remain; Kathleen requested that her petition for sole custody be granted; the Doyles requested that if Kathleen was not granted custody, then they wanted custody.

The trial judge ruled that there were material changes in circumstances, attributable to James, and stated that joint custody was not working. The order listed as material changes: (1) that James was already in a relationship with Desa pending divorce, which was not divulged to the court; (2) that James quickly remarried and moved Jacob out of his kindergarten class in Fayetteville; (3) that James moved the children into a two-bedroom apartment holding six residents; (4) that James failed to promptly notify Kathleen about the move, the injuries, and illnesses; (5) that Jacob was experiencing difficulty focusing in school, after James changed his school twice since divorce; and (6) that the children together suffered at least seven illnesses or injuries in James's custody likely resulting from inadequate supervision.

The judge found that Kathleen was not fit, financially or in parental judgment. The judge found in the order that James was not fit as a parent because (1) James alienated the children from Kathleen and failed to give Kathleen her right of first refusal to care for the children when he was not available; (2) James wrongly blamed Jacob for being tardy to class instead of escorting him to the classroom; and (3) James exhibited a lack of adequate parental supervision. Having found that "neither parent in this case have discharged their obligations as parents," the judge found that the children's best interest was served by granting custody to the grandparents because the Doyles were candid with the court, lived in a stable home and school district familiar to the children, and were financially and emotionally stable. The judge ordered alternating weekend visitation and alternating holiday visitation for the parents, removing any requirement of supervision with regard to Kathleen and lifting the no-contact order regarding Jerry. Kathleen was ordered to move out of her parents' house, though her visitation was ordered to take place there for overnight visits, and Jerry could not stay overnight. The children were ordered to have therapy, and each parent was ordered to undergo an evaluation and to pay child support. James appeals.

James argues on appeal that the finding that he was unfit is clearly erroneous. After our de novo review of the evidence in this case, while deferring to the credibility determinations made at trial, we agree and hold that the trial judge clearly erred in finding that James was unfit as a parent. We do not address whether the trial court's finding that Kathleen was an unfit parent is clearly erroneous as that finding was not appealed by her.

The trial court was correct in its assessment that the joint-custody arrangement was not working and that material changes in circumstances occurred. The evidence could support a finding that James failed to be the ideal parent to the children and failed to communicate with Kathleen at the level required by joint custody. Nevertheless, as between the Doyles and James, we reverse the divesting of custody from James because the evidence simply does not support a finding that James was an unfit parent.

■ The supreme court in *Lloyd v. Butts*, 343 Ark. 620, 624, 37 S.W.3d 603, 606 (2001), quoted with approval the following text from *Holmes v. Coleman*, 195 Ark. 196, 111 S.W.2d 474 (1937):

> Courts are very reluctant to take from the natural parents the custody of their child, and will not do so unless the parents have manifested such indifference to its welfare as indicates a lack of intention to discharge the duties imposed by the laws of nature and of the state to their offspring suitable to their station in life. When, however, the natural parents so far fail to discharge these obligations as to manifest an abandonment of the child and the renunciation of their duties to it, it then becomes the policy of the law to induce some good man or woman to take the waif into the bosom of their home[.]

■ The language is strong, requiring the manifestation of indifference to the welfare of the child or abandonment. The law prefers a parent over a grandparent or other third person, unless the parent is proved to be incompetent or unfit. *See, e.g., Schuh v. Roberson*, 302 Ark. 305, 788 S.W.2d 740 (1990). The preference is based on the child's best interests. *Stamps v. Rawlins*, 297 Ark. 370, 761 S.W.2d 933 (1988). The right of natural parents to the custody of their children as against others is one of the highest of natural rights, and the state cannot interfere with this right simply to better the moral and temporal welfare of the child as against an unoffending parent. *Payne v. Jones*, 242 Ark. 686, 415

S.W.2d 57 (1967). The test as to custody between a natural parent and a third person has never been based solely upon who can do the most for the child. *Rayburn v. Rayburn*, 231 Ark. 745, 332 S.W.2d 230 (1960). James's actions and inactions, though perhaps fraught with missteps, do not rise to the level of manifest indifference to the welfare of Jacob and Lexie. Moreover, we cannot ignore that Jacob and Lexie have a half-brother with whom they share a significant family relationship. In short, the circuit judge clearly erred.

■ Having reversed the finding that appellant is an unfit parent, we cannot return the parties to the original decree of joint custody because Kathleen was adjudged to be an unfit mother, a determination that she did not appeal. We reverse, with the result to vest custody in appellant. A remand is necessary because the trial judge is in a better position to determine what visitation the mother is now entitled, *Lynch v. Brunner*, 294 Ark. 515, 745 S.W.2d 115 (1988), and to set an appropriate amount of support for her to pay.

Reversed and remanded.

PITTMAN and ROAF, JJ., agree.