Kimberly Dawn SYKES *v.* Justin WARREN

CA 06-1002                                                258 S.W.3d 788

Court of Appeals of Arkansas
Opinion delivered June 13, 2007

*Melissa B. Richardson*, for appellant.

*Justin Warren*, for appellee.

JOHN B. ROBBINS, Judge. Appellant Kimberly Dawn Sykes appeals the May 16, 2006 order of the Craighead County Circuit Court that granted custody of her infant daughter, Brooke, to Brooke's biological father, appellee Justin Warren. In this one-brief appeal, appellant contends that the trial judge's decision to grant custody to Warren is clearly against the preponderance of the evidence and must be reversed. Her argument includes the following allegations of error in the consideration of appellee's request for custody: (1) improper consideration of appellant's receipt of governments benefits for her children instead of attaining gainful employment; (2) improper separation of Brooke from her three half-siblings in appellant's custody; (3) insufficient evidence to support the finding that appellee would better facilitate visitation with the non-custodian than appellant; and (4) insufficient evidence to support the finding that appellant's twin daughters with Down's Syndrome caused an undue drain on appellant's parental attention. We are convinced that the trial court clearly erred, and therefore we reverse the change of custody.

The standard of review in child-custody appeals is well settled. We review the evidence de novo, but we will not reverse the findings of fact unless it is shown that they are clearly contrary to the preponderance of the evidence. *Thompson v. Thompson*, 63 Ark. App. 89, 974 S.W.2d 494 (1998). We also give special deference to the superior position of the trial court to evaluate and judge the credibility of the witnesses in child-custody cases. *Hamilton v. Barrett*, 337 Ark. 460, 989 S.W.2d 520 (1999). A finding is clearly against the preponderance of the evidence when, although there is evidence to support it, the reviewing court is left

with a definite and firm conviction that a mistake has been made. *Hollinger v. Hollinger*, 65 Ark. App. 110, 986 S.W.2d 105 (1999); *see also Dunham v. Doyle*, 84 Ark. App. 36, 129 S.W.3d 304 (2003).

Specifically relevant to the current appeal is Ark. Code Ann. § 9-10-113 (Supp. 2005), which sets forth the law on custody of an illegitimate child. The statute provides:

> (a) When a child is born to an unmarried woman, legal custody of that child shall be in the woman giving birth to the child until the child reaches the age of eighteen (18) years unless a court of competent jurisdiction enters an order placing the child in the custody of another party.
>
> (b) A biological father, provided he has established paternity in a court of competent jurisdiction, may petition the circuit court in the county where the child resides for custody of the child.
>
> (c) The court may award custody to the biological father upon a showing that:
>
> (1) He is a fit parent to raise the child;
>
> (2) He has assumed his responsibilities toward the child by providing care, supervision, protection, and financial support for the child; and
>
> (3) It is in the best interest of the child to award custody to the biological father.

*See also Harmon v. Wells*, 98 Ark. App. 355, 255 S.W.3d 501 (2007) (explaining that in the context of paternity, if the father is given temporary visitation pending the order of paternity, then he is not held to the burden of demonstrating a material change in circumstances prior to a change in custody; however, if the visitation order is permanent, then he is required to show a change of circumstances, in addition to the statutory proof).

The salient facts are these: The parties were never married and never lived together, they had known each other most of their lives, and Brooke was born on March 17, 2005. The parties lived a few miles apart in Jonesboro. Appellant, approximately age thirty, was already the mother of three girls when Brooke was

born; appellee was not their father.[1] Appellee, in his early twenties, was present in the hospital for Brooke's birth, and he purchased a car seat, diapers, and formula for the baby. Appellee also placed Brooke on his health insurance policy the day after she was born, and he signed an Acknowledgment of Paternity.

Difficulties quickly arose between the parties regarding the care and visitation of Brooke. On April 20, 2005, appellee filed a "Petition for Paternity, Petition for Custody or in the Alternative for Visitation Privileges." In that petition, appellee alleged that he was the father; that he had taken responsibility for his daughter, he was a fit parent, and he wanted custody of Brooke because it was in her best interest; and that appellant should pay child support. Appellee alternatively asked for court-ordered visitation because he was being deprived reasonable visitation by appellant.

On May 5, 2005, appellant filed a response stating that appellee was the father; that she was the custodian; that they were unwed parents; that appellee was not a fit parent nor had he assumed responsibility for the child; that appellee should be ordered to pay child support; that appellee's work schedule was incongruent with being a custodian; that she had concerns about appellee's sister being around Brooke; and that appellee should be permitted only supervised visitation until he proved that he was capable of caring for Brooke.

There was an agreed temporary order following a temporary hearing in May 2005 that granted temporary custody to appellant, set forth standard visitation privileges for appellee, and ordered appellee to pay $82 per week in child support. Later that summer, the parties drew up their own temporary agreement regarding visitation pending the final hearing. They agreed that beginning mid-August 2005, appellee would have one or two three-hour evening visits during the week and alternating weekend visitation from 5:00 p.m. Saturday to 12:30 p.m. Sunday.

At the hearing conducted on December 14, 2005, appellee testified that he had been employed for five-and-a-half years as an assistant mill-head operator, and he changed his work shift so that he could exercise visitation with Brooke. Appellee still lived with

---

[1] Appellant's oldest daughter was fathered by Keith Barnes. Barnes pays child support and visits his daughter. The next two girls are twins, fathered by Gary Killian. The twins' father does not pay child support or visit them. Appellant receives $603 per month for each twin in SSI.

his parents, but he wanted custody and assured the court that he would acquire his own living quarters if he were granted custody. Appellee believed he had a more stable living environment and provided a Christian home. He said he would ensure that Brooke spent a lot of time with his extended family, although he did not rely on his parents to care for the baby unless his work conflicted with his visits. He said he had reliable transportation and always came to pick up his daughter for visits, and he said appellant never sent any supplies with Brooke. Instead, he said he bought all the necessary items and kept them at his parents' house.

Appellee complained that appellant would not keep him informed of any medical issues or provide him any medicine for Brooke. He also complained that appellant would not allow him visitation several times in July and over the Thanksgiving holiday. He agreed that they altered the visitation schedule, although he said it was to accommodate both of their schedules. Appellee stated some concern that appellant's twin daughters, who were about eight years old, might harm Brooke accidentally because they often threw things at play, they were developmentally delayed, and he thought the twins required an inordinate amount of attention from their mother. He also said that appellant's house was always messy, which was a hazard to Brooke. Appellee noted that he worked and paid child support, but appellant did not work and relied on Medicaid and other governmental assistance.

Appellee wanted full custody, but if he were not given that privilege, he thought joint custody would work as well. He assured the court that he would work with appellant to ensure that she enjoyed visitation if he had custody, and that he would be forthcoming with information about Brooke's health-care needs. Appellee did not claim that appellant was an unfit parent; he thought both of them were fit parents, but that Brooke's best interest was to be with him.

Appellant took the stand and testified that she had four daughters, she did not work, and she cared for them in their three-bedroom rent house. She said she received $224 in monthly child support from her oldest daughter's father, she received $1206 per month in SSI for her twin daughters who had Down's Syndrome, and she was currently receiving child support from appellee for Brooke. With that, she said she was able to support herself and her children, and she had the children on Medicaid, except that Brooke was now on appellee's insurance. Appellant

said that the twins received reduced-price lunches at elementary school. Appellant was approved for WIC, which provided Brooke's formula.

Appellant said she spent her time caring for her daughters, taking them to the park, to movies, to rodeos, and to family-oriented concerts. She was a full-time mother, and the older three girls attended school, leaving her available to care for the baby all day. Appellant agreed that there were some issues regarding visitation leading up to this hearing, but she felt justified in refusing when appellee's sister was present because appellant believed her to be a drug user. She believed that Brooke's father was entitled to visitation, but thus far, when there were problems, he would not work it out but would instead scream and cuss at her. She also said that appellee was the one who wanted to make changes in the visitation that ended up reducing his time with Brooke. Appellant believed that appellee was not a fit father, because he had a temper and was verbally and emotionally abusive. She said this was why their relationship deteriorated as her pregnancy with Brooke progressed. Additionally, appellant noted that oftentimes after appellee had Brooke for only a few hours, the baby's diaper would not be changed, which made her question his parenting skills.

She said she and her four daughters, at that time ranging from ten years to nine months old, had a good relationship, and she explained that her twins had only a mild form of Down's. She said she had been made aware through appellee's mother that appellee had all the necessary baby supplies at his parents' house, so that was why she never bothered to send any additional things with Brooke for visits. Appellant testified that she had no problem with appellee's parents but she did have a problem with his sister because of convictions and a drug problem.

In response to questions by the trial court, appellant conceded that her children were born out of wedlock and that she did not work out of her home, but she was steadfast in her belief that she was teaching them good morals, that they benefitted because she was an experienced parent, and that it was best for them to have her present in the home for them every day. She said she was not on food stamps or housing assistance; rather, she lived on child support from the oldest and youngest children, the twins' SSI, and had the twins on reduced-price lunches and Medicaid as well as WIC for baby formula. With that and good management, she was able to provide for the girls' needs and be home full-time. She agreed she had never been married to any of her children's fathers,

and the one man she was married to ended in divorce because he was a drug addict. However, she believed that she provided a fine home, that appellee was not emotionally stable, and that he did not know how to take care of a small child. The trial judge, in remarks and questioning, clearly disapproved of her not working and having children in succession as an unwed mother.

The trial judge stated that she would take the matter under advisement. A letter opinion was issued on March 29, 2006. The four-page letter outlined the testimony discussed above, and made the following relevant findings:

> Ms. Sykes [appellant] was unwed at the time of the birth of this child and therefore the presumption of custody lies with her. To her credit, Ms. Sykes does have her own living quarters, she has other siblings with which the child may spend time and Mr. Warren [appellee] has voluntarily given up large portions of his visitation in the past.
>
> On the other hand, Mr. Warren certainly appears to be the more stable and responsible adult. He has been regularly employed for the past five and one-half (5½) years while Ms. Sykes has not had a job in the last ten (10) years. His concerns regarding the mother's attention for the care of her disabled children seem appropriate and well placed. Mr. Warren appears to have support from his family. He has taken responsibility for the child in filing the appropriate legal proceedings, buying necessities for the child, adding the child on insurance and so forth. The Court believes Mr. Warren is the parent more likely to facilitate visitation with the non-custodial parent, and the parent more likely to provide a stable, wholesome environment for the child. Therefore, this Court finds that Mr. Warren has overcome the presumption of custody with the mother and that the best interest of this child dictate that custody be placed with Mr. Warren.
>
> . . . .
>
> Because of the objections of Ms. Sykes to Mr. Warren's sister and the questions regarding her fitness to care for this child, the child shall not be left alone in her care.

A formal order was filed on May 16, 2006, commemorating this disposition. Appellant filed a timely notice of appeal, challenging the award of custody to appellee. Appellant contends that the

trial court committed reversible error in making this best-interest decision. She expounds on this argument by stating primarily that: (1) the court was improperly influenced by its apparent disapproval of appellant not working and living off government aid; (2) the court should not have separated the siblings absent some exceptional circumstance; (3) the court was wrong to believe that appellee would better facilitate visitation issues; (4) the court was wrong to believe that the twins took undue parenting effort away from Brooke. She adds in her brief that the trial judge erred because she was not found to be an unfit mother, and because more weight should have been given to the fact that appellee relinquished hours of visitation pending the final hearing. Because on the whole, we are left with a definite and firm conviction that an error has been committed, we reverse.

■ We note at the outset that, contrary to appellant's assertion, the trial court did not have to find her unfit in order to grant custody of Brooke to her father. Once appellee showed to the satisfaction of the trial court that he was a fit parent and had taken responsibility for his child, the trial court was left solely to make a best-interest determination. Ark. Code Ann. § 9-10-113.

■ Moving to the best-interest determination, we recognize that unless exceptional circumstances are involved, young children should not be separated from each other by dividing their custody. *Johnston v. Johnston*, 225 Ark. 453, 283 S.W.2d 151 (1955); *Vilas v. Vilas*, 184 Ark. 352, 42 S.W.2d 379 (1931). *But see Middleton v. Middleton*, 83 Ark. App. 7, 113 S.W.3d 625 (2003). The trial court noted this fact in the order, but did not give it much weight. No exceptional circumstances were presented to support separation of the siblings.

In addition, we believe it was error to use appellant's lack of employment and receipt of government benefits as a negating factor against appellant. Indeed, appellant lived within her means, was receiving child support due her, was receiving legitimate governmental aid for her disadvantaged daughters, and managed to run an independent household where she could be a full-time parent. Professor Jeff Atkinson in his treatise on child custody states that "financial resources of the parties are normally irrelevant to a custody determination." 1 Jeff Atkinson, *Modern Child Custody Practice* § 4-20, at 4-47 (2d ed. 2002). He adds, though, that "financial resources of the parents have been found to be relevant to the extent that they reflect a parent's ability to provide a stable

home." *Id.* This text was cited with approval in *Taylor v. Taylor,* 353 Ark. 69, 110 S.W.3d 731 (2003). The court in *Taylor* remarked that it knew of no cases where custody was changed merely because one parent had more resources or income than the other. *See id.* We believe this reasoning is especially appropriate here.

Another factor that the trial court deemed relevant in the best-interest inquiry was that the twins took inordinate amounts of attention for care in appellant's household. There is no support for that statement. The twins were school-age and spent their days at school, along with the oldest daughter. This freed appellant to be a full-time parent solely to the baby during the school year. To the extent that the twins took extra time when they were at home, this is to be considered against the preference to keep siblings together, as we discussed above.

■ The last major concern noted by the trial court was that appellee would be the parent more likely to facilitate visitation with the non-custodian. While certainly we are duty-bound to honor the credibility determinations made by the trial court, we disagree that this sole factor is enough to support a finding that the best interest of this child was better served in her father's custody. Moreover, the trial court acknowledged that the father voluntarily relinquished large amounts of visitation, which we cannot ignore.

On the other hand, the father had held down a full-time job for several years, had his family to support his parenting, and had taken responsibility for the child. Nevertheless, he lived with his parents, he had a sister who could not be left alone with the child due to drug-abuse concerns, and he had no experience in raising a child.

Although there is evidence in the record to support the decision to award custody to the father, we are left with a distinct and firm impression that there was clear error in awarding custody to the father instead of the mother of this child. Therefore, the trial court's decision is reversed and remanded.

HART, GLOVER, and BAKER, JJ., agree.

GLADWIN and MILLER, JJ., dissent.

ROBERT J. GLADWIN, Judge, dissenting. I cannot say that the trial court's findings were clearly contrary to the preponderance of the evidence; therefore, I dissent. The majority opinion adequately states the relevant facts.

In reviewing child-custody cases, we consider the evidence de novo, but will not reverse the trial court's findings unless they are clearly erroneous or clearly against the preponderance of the evidence. *Middleton v. Middleton*, 83 Ark. App. 7, 113 S.W.3d 625 (2003). A finding is clearly against the preponderance of the evidence when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. *Id.* We also give special deference to the superior position of the trial court to evaluate and judge the credibility of the witnesses in child-custody cases. *Durham v. Durham*, 82 Ark. App. 562, 120 S.W.3d 129 (2003). We know of no cases in which the superior position, ability, and opportunity of the trial court to observe the parties carry as great a weight as those involving children. *Dunham v. Doyle*, 84 Ark. App. 36, 129 S.W.3d 304 (2003). In custody cases the primary consideration is the welfare and best interest of the child involved, while other considerations are merely secondary. *Durham, supra.*

This case simply turns on a best-interest analysis. The trial court found, as a result of the testimony, that the appellee acknowledged paternity of the parties' child and had taken responsibility for her in the face of adverse conditions and increasing objections from appellant. Further, the trial court found appellee to be the more stable and responsible adult. Whether a parent is stable and responsible goes to the best interest of the child. I disagree with the majority's statement that the trial court's finding that appellee would be the parent more likely to facilitate visitation with the non-custodian is the sole factor that supports the finding that custody should be placed with appellee. The trial court considered all the testimony presented. Further, the special needs of the twins is a proper factor for the court to consider when looking toward the best interest of the parties' child. Appellee held a full-time job, had the support of his family, and had taken responsibility for his child.

The trial court was in the superior position to evaluate and judge credibility of the witnesses. Given the special deference that we give to this superior position, I am not left with a distinct and firm impression that the trial court clearly erred.

MILLER, J., joins.