Andrea HICKS  *v.*  Joshua A. COOK

CA 07-1321                                     288 S.W.3d 244

Court of Appeals of Arkansas
Opinion delivered October 1, 2008

[Rehearing denied November 19, 2008.*]

---

* HART and HEFFLEY, JJ., would grant rehearing.

*Eubanks, Baker & Schulze*, by: *J. G. "Gerry" Schulze*, for appellant.

*Haddock & Tisdale, P.A.*, by: *James W. Haddock*, for appellee.

ROBERT J. GLADWIN, Judge. Appellant Andrea Hicks appeals the custody order filed August 31, 2007, in Chicot County Circuit Court. She contends the trial court erred in awarding custody of her son to appellee Joshua A. Cook, the biological father, impermissibly basing the decision on its perceptions of her religious preferences and mental health. Giving special deference to the trial judge's ability to evaluate and judge the credibility of the witnesses, we affirm the trial court's order.

### Facts

The child, a two-year-old boy, was born out of wedlock on January 17, 2005, and the biological father's name was placed on the birth certificate. The father voluntarily paid child support to appellant and enjoyed liberal visitation with his son. On February 6, 2007, the father filed a custody petition. At the custody hearing held August 9, 2007, the father testified he had been remarried in February 2007, that he lives in Smackover, Arkansas, that his new wife has two daughters, and that he has joint custody of a daughter with an ex-wife, to whom he pays $400 per month in child support.

The father testified about dog bites or wounds on the boy's shoulder, terrible diaper rash, dirty fingernails and toenails, a bad earwax condition, and some sort of fungus on the child's face, all of which were discovered by him at the same time. These discoveries prompted the custody petition. Further, the father testified about all the family that live around him, the access to parks and a good preschool in Smackover, and the willingness of his family to help. His grandmother and in-laws each testified that he is a great father and that they would be willing to help if he were

awarded custody. His ex-wife, the mother of his daughter, testified that he is a great father and that she and her new husband send the new husband's child with the daughter for visitation.

Appellant testified that she lives in Little Rock, that she is a nursing assistant, and that she wants to go back to school to be a social worker. She testified that the boy's shoulder wound was from a dog bite, and that the dog hair in the car seat came from her brother's dog. She stated she had several prescriptions for anxiety and sleeplessness, but that she does not take those anymore. She testified that she only *told* the father she was practicing Wicca, but that she was really a Baptist. She explained to the trial court that Wicca was an earth religion that had gods and goddesses and believed in doing good.

The trial court awarded custody to the father, citing Arkansas Code Annotated section 9-10-113 (Supp. 2007), and found the father met the requirements of assuming his responsibilities toward the child by providing care, supervision, protection, and financial support. The trial court also found that he was a fit parent to raise the child and it was in the child's best interest to be in the father's custody. The trial court cited its grave concerns regarding the mother's ability to raise the child in a safe and nurturing manner. The judge cited the child's dirty state, the wound on his shoulder, and the mother's nonchalance. He cited concerns over the mother's mental health, in that she had filled prescriptions for medications to treat anxiety, depression, and sleeplessness, but that she quit taking the medication. Finally, he stated his concern over her testimony regarding the Wicca religion, stating she probably was more involved in it than she led the court to believe. The court awarded the mother reasonable visitation and did not require her to pay child support. This appeal timely followed.

*Law*

Arkansas Code Annotated section 9-10-113(a) provides that an illegitimate child shall be in the custody of its mother unless a court of competent jurisdiction enters an order placing the child in the custody of another party. *Freshour v. West*, 334 Ark. 100, 971 S.W.2d 263 (1998). Section 9-10-113(b) provides that a biological father may petition the court for custody if he has established paternity in a court of competent jurisdiction. *See id.* Custody may be awarded to a biological father upon a showing that (1) he is a fit parent to raise the child; (2) he has assumed his responsibilities toward the child by providing care, supervision, protection, and

financial support for the child; and (3) it is in the best interest of the child to award custody to the biological father. Ark. Code Ann. § 9-10-113(c).

In *Harmon v. Wells*, 98 Ark. App. 355, 255 S.W.3d 501 (2007), this court analyzed two cases that relied upon Arkansas Code Annotated section 9-10-113, and held that in order to determine which standard the trial court should use in a custody dispute involving parties who were not married at the time the child was born — best interests of the child (as is utilized for initial custody determinations) or material change of circumstances (which is used when custody is being changed) — the issue rests entirely on whether the initial order in the paternity action was permanent or temporary. If it was permanent, the trial court should follow *Norwood v. Robinson*, 315 Ark. 255, 866 S.W.2d 398 (1993), and require a change of circumstances to change custody. If it was temporary, the trial court should follow *Sheppard v. Speir*, 85 Ark. App. 481, 157 S.W.3d 583 (2004), and conclude that there is no need for the father to prove changed circumstances to obtain custody.

■ Here, the trial court did not consider that a paternity action was never filed, but acknowledged that the father's name was on the birth certificate, there was never a question as to the paternity, and the father was paying child support on his own accord. When the father filed a petition for custody, the trial court correctly interpreted it as the initial custody determination. Therefore, the trial court's duty was to determine the best interests of the child in making an initial custody determination.

In reviewing child-custody cases, we consider the evidence de novo, but will not reverse the trial court's findings unless they are clearly erroneous or clearly against the preponderance of the evidence. *Middleton v. Middleton*, 83 Ark. App. 7, 113 S.W.3d 625 (2003). A finding is clearly against the preponderance of the evidence when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. *Id.* We also give special deference to the superior position of the trial court to evaluate and judge the credibility of the witnesses in child-custody cases. *Durham v. Durham*, 82 Ark. App. 562, 120 S.W.3d 129 (2003). We know of no cases in which the superior position, ability, and opportunity of the trial court to observe the parties carry as great a weight as those involving children. *Dunham v. Doyle*, 84 Ark. App. 36, 129 S.W.3d 304 (2003). In custody cases, the primary consideration is the

welfare and best interest of the child involved, while other considerations are merely secondary. *Durham, supra.*

*Wicca*

Appellant argues the trial judge impermissibly based his decision on his perceptions of her religious preferences. The trial judge's letter of August 16, 2007, states as follows:

> One final concern is her testimony regarding the WICCA religion, movement, cult or whatever that may be. She testified that she told Mr. Cook she was involved, but was only joking. That is no joking matter. The Court believes she is much more involved than she would now lead us to believe.

Appellant argues that the above comments showed an impermissible prejudice. She claims that "cult" is pejorative, and argues there was no evidence that Wicca was anything other than a nature religion. She claims the judge's comments have a chilling effect on religion and freedom of religious exploration. She argues it is a burden on the freedom of religion for the trial court to have determined custody based upon her investigation of a religion not approved by the State. She contends that the trial judge considered her religion, which should have been irrelevant, and maintains that his comments prove he considered it. Therefore, the presumption that he relied only on admissible evidence has been rebutted. *See Mitchell v. City of North Little Rock*, 15 Ark. App. 331, 334, 692 S.W.2d 624, 626 (1985).

Appellant expounds on this argument, claiming that the dissent in *Johns v. Johns*, 53 Ark. App. 90, 95, 918 S.W.2d 728, 732 (1996), notes that intervention in matters of religion is a perilous adventure upon which the judiciary should be loath to embark. In *Johns*, the trial court ordered the non-custodial parent to take his children to church and Sunday school. The trial court was affirmed, but the vote was split. This court held:

> The chancellor did not order him to attend religious services, but rather that he see that his children did so in order to maintain consistency in the religious regimen that their mother has set for them. Therefore, no limitation has been placed on appellant's freedom of religion. Because the chancellor's order imposes no duty on him to attend, appellant is free to attend or not attend the services with the children.

*Id.* at 94, 918 S.W.2d at 731.

Appellant herein argues that the U.S. Constitution and the Arkansas Constitution prohibit discrimination on the basis of religious belief. She maintains that Wicca is a religion for purposes of the First Amendment. Arkansas courts have not addressed the issue; however, she argues that the testimony here establishes that Wicca is a mode of worship as set out in the Arkansas Constitution. She claims that from the trial judge's comments, it is obvious he disapproves of Wicca. Appellant maintains that his prejudice is constitutionally impermissible.

Appellant contends that no substantial evidence links her religious beliefs and interests — whatever they may be — with the child's well being. She is correct. Our cases say that a parent's moral instruction of the child, which may include religious beliefs, is an issue in determining the child's best interest. *Digby v. Digby*, 263 Ark. 813, 567 S.W.2d 290 (1978); *Plum v. Plum*, 252 Ark. 340, 478 S.W.2d 882 (1972); *McCullough v. McCullough*, 222 Ark. 390, 260 S.W.2d 463 (1953). Therefore, religious beliefs and practices are only material as they affect children's best interests. However, in this case, no party explored the connections between religious belief and upbringing.

The father argues that appellant never raised the constitutional issues regarding Wicca at the trial-court level and they should not be considered on appeal. However, the father also contends that the trial judge did not impermissibly base his decision on his perception of appellant's religious preferences. We agree.

Setting aside the trial judge's comments regarding Wicca, the evidence before the trial court in this initial custody determination was that the father had a clean, stable, loving environment for the child, and while in the mother's care, the child endured dog bites, diaper rash, a facial fungus, and dirty fingernails and toenails. Further, appellant had been prescribed medications for depression and anxiety, but determined without doctor's advice to quit taking the medications. The trial court ruled the father proved he had assumed his responsibilities toward the child by providing care, supervision, protection, and financial support for the child, and he proved he was a fit parent to raise the child. These were not denied by appellant.

In the trial court's letter opinion, the trial judge stated his concern about appellant's credibility relative to the extent of her involvement with Wicca. The trial court clearly did not

believe appellant's testimony that she was merely joking about her interest in Wicca. Appellant urges this court to consider the trial court's mention of Wicca to represent an expression of prejudice. However, there is no basis to hold that the trial court resolved this initial custody determination on appellant's interest or involvement with Wicca, but simply pointed out appellant's lack of credibility on the issue. We decline to accept appellant's argument that this case turns on the trial court's acceptance or rejection of a specific religion. Instead, the trial court, in this initial custody determination, considered appellant's credibility on a matter testified to before it. Remembering to give special deference to the trial judge's ability to evaluate and judge the credibility of the witnesses, we hold that the trial court was not clearly erroneous in judging appellant incredible on this issue. Moreover, even if the Wicca issue went beyond credibility and otherwise affected the merits in the circuit court's decision, precedent allows us to disregard an improper factor and affirm if the court's other reasons for changing custody were proper and adequate. Compare *Dansby v. Dansby*, 87 Ark. App. 156, 189 S.W.3d 473 (2004), with *Sykes v. Warren*, 99 Ark. App. 210, 258 S.W.3d 788 (2007). And, as discussed above, no clear error exists on those other factors.

### Mental Health

Appellant argues that the trial judge impermissibly based his decision on a conclusion about her mental health that was not in evidence. She claims there was no medical evidence admitted. Further, she argues there was no indication that she was engaged in bizarre behavior in any way inconsistent with the best interest of her child. Therefore, she contends there was no basis for the judge to conclude the child would be better off if the mother took medications that had been prescribed to her in the past.

The father argues that the trial judge properly considered appellant's mental health and physical condition. He claims the evidence showed that shortly before trial, appellant received prescriptions for depression, anxiety attacks, sleeplessness, and restlessness. At trial, she claimed to be "between doctors." The trial court stated, "The court does not believe that depression and anxiety occurred overnight. If she suffers from these conditions and she obviously does, the child would be much better off if she took her medicine." Based on what she told the doctor, she received those medications. Later, she apparently declared herself

to be well because she stopped taking the prescribed medications, according to her testimony. Again, giving special deference to the superior position of the trial court to evaluate and judge the credibility of the witnesses in child-custody cases, we find no error. Accordingly, we affirm.

Affirmed.

GLOVER, J., agrees.

GRIFFEN and MARSHALL, JJ., concur.

HART and HEFFLEY, JJ., dissent.

WENDELL L. GRIFFEN, Judge, concurring. I join the majority because I agree that the trial judge did not err in awarding custody of Joshua to appellee. I write separately to emphasize that the change of custody in this case does not turn on appellant's religion, be it Baptist, Methodist, Wiccan, or no religion at all. The issue is whether the trial judge's change of custody is clearly erroneous where he found that appellant failed to provide a safe and sanitary home environment for the child, where he cited concerns regarding appellant's mental health, and where he mentioned appellant's involvement in Wicca, expressed disbelief in appellant's testimony that she was joking concerning her involvement with Wicca, and expressed concern about appellant's truthfulness regarding the extent of her interest or involvement with Wicca.

First, there is no basis for us to hold that the trial court resolved the change-of-custody dispute on appellant's interest in or involvement with Wicca, despite the substantial emphasis devoted to that subject by both parties on appeal. The parties argue as if they tried the matter of appellant's involvement in Wicca to the trial judge, and argue as if the trial judge decided the custody issue on that basis. However, neither party below objected to the trial judge considering appellant's involvement in Wicca. As appellant did not object to any questions about Wicca, and as the trial judge made no disparaging or otherwise unfavorable comments about Wicca during the trial or in the letter opinion, her contention that she lost custody of her child due to judicial religious bigotry is bottomed on conjecture and surmise.

Second, even if one considers the trial judge's mention of Wicca to represent an expression of prejudice, the prejudice was not against Wicca but was against what the judge considered

appellant's lack of truthfulness concerning her interest or involvement in Wicca. The trial judge clearly did not believe appellant's testimony that she was merely joking about her interest in Wicca. We routinely defer to a trial judge's determination regarding witness credibility. That this trial judge expressed concern about the truthfulness of appellant's testimony concerning Wicca does not warrant reversal.

Ultimately, the trial judge changed custody because he found that appellant failed to provide a safe and sanitary home environment for the child, and due to his concerns about appellant's mental health. Those reasons, supported by the record before us, constitute sufficient grounds for changing custody, no matter what the trial judge concluded regarding appellant's truthfulness as to her involvement with Wicca.

D.P. MARSHALL JR., Judge, concurring. I join the court's opinion. But I write separately to express my concerns about our standard of appellate review. It is a contradiction. This case makes the point: one of the main issues dividing our court is which aspect of the standard — *de novo* or clear error — controls our review. The court defers to the circuit court's findings of fact. My dissenting colleagues sift the facts and find them wanting. This choice, in my view, determines the differing conclusions on the merits. Our supreme court should clarify this important issue, which is passed over in these cases with routine citations but no analysis: what is the correct standard of appellate review in cases involving equity?

The court and my dissenting colleagues begin on common ground. We are supposed to review this equity matter *de novo* on the record as a whole, but not reverse unless the circuit court's factual findings are clearly erroneous or clearly against the preponderance of the evidence. *Rawe v. Rawe*, 100 Ark. App. 90, 95, 264 S.W.3d 549, 552 (2007). This is like saying that we review the judgment for green redness.

The plenary aspect of the standard has deep roots in chancery practice. It springs in part from the kind of appellate review given long ago in chancery cases where there was no testimony except by depositions. 9 W.S. HOLDSWORTH, A HISTORY OF ENGLISH LAW 353-58, 369 (1926). In that context, *de novo* review made some sense. A panel of appellate judges could reconsider afresh the decision of one chancellor on a paper record equally accessible at both levels. There is a broader historical context: before merger, different primary methods of appellate review

existed for law cases and equity cases. In general, law cases were reviewed on writs of error, while equity cases were reviewed by appeal. Chief Justice Ellsworth explained the distinction: "An appeal is a process of civil law origin, and removes a cause entirely; subjecting the fact as well as the law, to a review and retrial: but a writ of error is a process of common law origin, and it removes nothing for re-examination but the law." *Wiscart v. D'Auchy*, 3 Dallas 321, 327 (1796); *see generally* ROSCOE POUND, APPELLATE PROCEDURE IN CIVIL CASES 300-01 (1941) (describing further procedural variations in nineteenth-century equity appeals). These are the old truths that our courts still express when they say that equity cases are tried *de novo* on appeal. *E.g., Ferguson v. Green*, 266 Ark. 556, 563-64, 587 S.W.2d 18, 23 (1979); *Equity General Agents, Inc. v. O'Neal*, 15 Ark. App. 302, 307, 692 S.W.2d 789, 792 (1985).

In the *ConAgra* case, a unanimous supreme court expounded this kind of searching review on its way to reversing the decree.

> Equity cases are tried de novo on appeal upon the record made in the chancery court, and the rule that this court disposes of them and resolves the issues on that record is well established; the fact that the chancellor based his decision upon an erroneous conclusion does not preclude this court's reviewing the entire case de novo. An appeal in a chancery case opens the whole case for review. All of the issues raised in the court below are before the appellate court for decision and trial de novo on appeal in equity cases involves determination of fact questions as well as legal issues. The appellate court reviews both law and fact and, acting as judges of both law and fact as if no decision had been made in the trial court, sifts the evidence to determine what the finding of the chancellor should have been and renders a decree upon the record made in the trial court. The appellate court may always enter such judgment as the chancery court should have entered upon the undisputed facts in the record.

*ConAgra, Inc. v. Tyson Foods, Inc.*, 342 Ark. 672, 677, 30 S.W.3d 725, 728-29 (2000).

But our judicial system has changed. By the end of the nineteenth century, chancellors in most jurisdictions were routinely hearing live testimony. Charles Alan Wright, *The Doubtful Omniscience of Appellate Courts*, 41 Minn. L. Rev. 751, 764-66 and n. 61 (1957). In 1978, the Arkansas Supreme Court adopted our

Rules of Civil Procedure, which governed chancery and law cases and provided for clear-error review of the court's factual findings. Ark. R. Civ. P. 1 & 52(a). Amendment 80 to the Arkansas Constitution and the implementing amendment to Rule of Civil Procedure 2 merged law and equity. *Clark v. Farmers Exchange, Inc.*, 347 Ark. 81, 83 n.1, 61 S.W.3d 140, 141 n.1 (2001); Ark. R. Civ. P. 2, Addition to Reporter's Notes, 2001 Amendment. But our often-stated rule of *de novo* review in cases involving equity has endured, even though the main reasons for it have not.

The clear-error aspect of our standard of review is more deferential. It embodies the command of Rule 52(a): "Findings of fact, whether based on oral or documentary evidence,[1] shall not be set aside unless clearly erroneous (clearly against the preponderance of the evidence), and due regard shall be given to the opportunity of the circuit court to judge the credibility of the witnesses." The books are full of cases holding that we must defer to the trial court's superior position to evaluate the credibility of witnesses — whom they see and hear and we do not. *E.g., Hamilton v. Barrett*, 337 Ark. 460, 465, 989 S.W.2d 520, 523 (1999). In custody matters, moreover, we give special deference to the circuit court's weighing of the multitude of circumstances comprising the best interest of children. *Taylor v. Taylor*, 345 Ark. 300, 304, 47 S.W.3d 222, 224 (2001).

Review for clear error is incompatible with a trial *de novo* on appeal. We cannot act "as judges of both law and fact as if no decision had been made in the trial court, sift[ing] the evidence to determine what the finding of the [trial court] should have been . . . .[,]" *ConAgra*, 342 Ark. at 677, 30 S.W.3d at 728, and — at the same time — give "special deference to the superior position of the trial court to evaluate and judge the credibility of the witnesses . . . .[,]" *Sykes v. Warren*, 99 Ark. App. 210, 211, 258 S.W.3d 788, 788 (2007), reversing only if the decision below is clearly wrong. *Rawe*, 100 Ark. App. at 95-98, 264 S.W.3d at 552-54. This is an impossible task. And our imperfect performance of it leads to uncertainty and inconsistency.

---

[1] This phrase was added to the Federal Rule in 1985, and to the Arkansas Rule in 1989, to make clear that the same standard of appellate review applies regardless of whether the trial court's findings were based on oral or written evidence or both. Ark. R. Civ. P. 52, Addition to Reporter's Notes, 1989 Amendment; Fed. R. Civ. P. 52, Advisory Committee Notes, 1985 Amendment.

When he was a member of this court, Justice Newbern revealed in a dissenting opinion what he called "perhaps the least guarded secret" about appellate review in our equity cases. *Warren v. Warren*, 270 Ark. 163, 170, 603 S.W.2d 472, 475-76 (Ark. App. 1980). If the appellate court plans to reverse, then it emphasizes the *de novo* aspect of the standard of review; if the court plans to affirm, then it emphasizes the deference in the clear-error aspect of the standard. *Ibid*. Litigants deserve better.

Clear-error review promotes the healthy administration of justice by keeping trial courts and appellate courts in their proper places. Fact questions in nonjury cases are primarily for the trial courts, just as appellate courts sit primarily to correct errors of law and clarify the law. Clear-error review is not toothless. When the record as a whole leaves the appellate court with the definite and firm conviction that the circuit court made a mistake of fact, then the judgment is vulnerable to reversal or modification. *ConAgra*, 342 Ark. at 677, 30 S.W.3d at 729. Straight-up issues of law deserve and receive *de novo* review no matter what kind of case they arise in. *Helena-West Helena School District v. Monday*, 361 Ark. 82, 85, 204 S.W.3d 514, 516 (2005). But findings of fact deserve deference, especially when they embody evaluations of witnesses' demeanor.

Our law can and should maintain the traditional appellate flexibility to affirm a judgment as modified or remand for more findings in cases that, before Amendment 80, would have been chancery matters. *Ferguson*, 266 Ark. at 564-69, 587 S.W.2d at 23-26 (Fogleman, J.). We do not need a "trial *de novo* on appeal" to preserve this flexibility. This out-dated expression no longer captures what happens on appeal. When we talk at the threshold of these cases about *de novo* review, sifting facts, and being judges of the facts, we confuse the primary appellate task. We should stop. We should review circuit courts' findings of fact for clear error pursuant to Rule 52(a). And if we discern a clear error in a case involving equity, only then should we sift the facts as we decide whether justice would be better served by modifying the judgment or remanding the case.

JOSEPHINE LINKER HART, Judge, dissenting. For the third time in a month I find myself dissenting in a child-custody

case in which the same four judges have cast the deciding votes.[1] Though remarkable enough, it is even more noteworthy because for the second time in a week I find myself compelled to once again call attention to how this majority has tortured the law and mishandled the judicial-review process to reach their result.

Regarding Hicks's first point, that the trial judge erred in basing his change-of-custody decision on Hicks's alleged practice of Wicca, I am glad that there is unanimous agreement on this court that basing a custody decision on a parent's religious beliefs is unequivocally wrong. Nonetheless, the majority in one way or another excuses this obvious trial court error. I believe Judge Griffen is simply wrong when he asserts that "the trial judge made no disparaging or otherwise unfavorable comments about Wicca." In his written findings, the trial judge referred to Wicca as a "cult."[2] The *American Heritage Dictionary* defines "cult" as "a religion or religious sect generally considered to be extremist or bogus." There are none that are so blind who will not see.

The remaining Judges handle this inconvenient fact with no greater acumen. The main opinion simply "sets aside" the trial judge's comments regarding Wicca. Along the way, however, they twist the words in the finding regarding Hicks's alleged practice of Wicca to be a finding regarding Hicks's credibility, notwithstanding the fact that this case does not turn on the credibility of any witness! While our convention of deferring to the finders of fact on issues of credibility is well established, it is troubling to discover that this opinion seems to betray the belief by the majority that this deference is somehow the way to resolve every case.[3]

---

[1] There is a main opinion with two judges in complete agreement and two concurring opinions that diverge from the main opinion on key issues, but still suppport the main opinion's disposition.

[2] Interestingly enough, the only description of Wicca as a "cult" came from a proffered hearsay definition that was properly excluded by Hicks's timely objection, but nonetheless considered as evidence by the trial judge. Neither the testimony of Hicks nor Cook, which was the only properly admitted evidence, mentioned the word "cult." The definition, from the *American Heritage Dictionary*, stated that Wicca is "the cult of witchcraft."

[3] In Judge Marshall's concurrence, he has betrayed his lack of understanding of the standard of review when he equates it to reviewing "the judgment for green redness." I note that he has previously cited an incorrect standard of review in a domestic relations case. In *Brandt v. Willhite*, 98 Ark. App. 350, 353, 255 S.W.3d 491 (2007), he stated that the standard of review was as follows: "In reviewing the circuit court's decisions, we defer to that court's

The treatment of Hicks's second point by the majority is no more satisfactory. Hicks argues that the trial court "impermissibly" based its decision on a conclusion about her mental health that was unsupported by substantial evidence. She asserts that there is "absolutely no evidence that [she] had continuing medical problems" or that an episode of "situational depression and anxiety" cannot be cured "overnight." Moreover, she contends that there was absolutely no suggestion that she engaged in "even the slightest bizarre behavior or behavior in any way inconsistent with the best interest of her child."

In rejecting Hicks's argument, to the extent that the majority addresses it at all, the main opinion betrays a lack of understanding of how our deference to the trial judge on issues of credibility affects this case. Aside from the evidence that medication had been prescribed for Hicks to treat anxiety and depression, there was no evidence that she currently suffered from either of these maladies. The prescriptions were, at best, circumstantial evidence that the conditions existed at the time the medication was prescribed. The trial judge was not competent to make a medical diagnosis, nor was the factual basis for his finding susceptible to being proved by judicial notice.[4] If a court takes judicial notice of any fact, it must be so notoriously true as not to be subject to reasonable dispute or must be capable of immediate accurate demonstration. *Collier-Dunlap Coal Co. v. Dickerson*, 218 Ark. 885, 239 S.W.2d 9 (1951). Whether or not a person suffers from depression and the efficacy of treatment are facts that are subject to dispute. Furthermore, the personal knowledge of the judge is not judicial knowledge of the court, for there is no way of testing the accuracy of knowledge that rests entirely within the breast of the court. *Walker v. Eldridge*, 219 Ark. 594, 243 S.W.2d 638 (1951). Therefore the finding concerning Hicks's continuing need for medication is based on mere speculation and conjecture and cannot be a reason for changing custody. In finding that Hicks still suffered from depression and anxiety, the trial judge was actually

---

superior position for measuring the witnesses' credibility and evaluating what was in the child's best interest." This is not review; this is abdication.

[4] Arkansas Rule of Evidence 201(b) provides that "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

practicing medicine without a license, not making a credibility determination. Even more chilling is the fact that in Judge Griffen's concurrence, he states that a trial judge's "concerns about appellant's mental health" are an appropriate basis to change custody.

Finally, I note with appropriate irony that the majority's failure to effectively address Hicks's argument that evidence of J.O.C. "being dirty and having rashes and a dog bite wound" is not adequate to support a change of custody, is the soundest aspect of their opinion. We had before us the same photographs that the trial judge found "quite revealing," and apparently the entire panel did not share the trial judge's "concern." While there was clearly some dirt under J.O.C.'s nails, the child was not unkempt, and while it was certainly true that J.O.C. had diaper rash, Cook himself testified that it was not an unusual for a child of that age to be so afflicted. Furthermore, the photos revealed that Hicks was treating the rash with a topical ointment, which was not a markedly different treatment than Cook prescribed. Finally, I believe that the so-called "wound" on J.O.C.'s shoulder was likely just a bug bite, as Cook hypothesized.

By all indications, J.O.C. was a happy, active, and thriving young child — flourishing in his mother's care. There was no proof that J.O.C.'s residence was inappropriate and, aside from an apparently isolated incident in which J.O.C. went to a visit wearing ill-fitting shoes, that Hicks was not attending to her child's material needs. By any standard, the trial court clearly erred in changing custody.

SARAH J. HEFFLEY, Judge, dissenting. I dissent. The trial court in this case impermissibly considered appellant's alleged interest in Wicca, which taints the outcome of its decision to change custody. The trial court's mention of Wicca cannot be dismissed as a simple credibility determination. It is clear from the trial judge's comments that he was concerned that appellant was more involved than she would admit. Obviously, the judge held her interest in Wicca against her.

In the absence of the Wicca consideration, we are left with a child who is moved from his home since birth, based on one occasion on which he had dirty fingernails (not unusual in a toddler), a common diaper rash (not unusual in a toddler), a messy car seat (not unusual with a toddler), earwax (not unusual in a toddler), and an alleged dog bite, which does not necessarily arise

from neglect. The child was removed from a home, which the record reflects was otherwise appropriate in every way. In making its determination, the trial court also made a medical diagnosis without the benefit of expert testimony or reports of any type. Far be it for someone to stop taking medication that one does not need. I would reverse and remand for consideration without reference or regard to Wicca or an inappropriate medical diagnosis.

## SUPPLEMENTAL OPINION ON DENIAL OF REHEARING
## NOVEMBER 19, 2008.

JOSEPHINE LINKER HART, Judge, dissenting. I dissent from this court's denial of rehearing. As the appellant points out, this court committed a clear error by ignoring the obvious fact that the trial judge based his change-of-custody decision in large part on his finding that the appellant was a participant in some nefarious "cult." The majority was wrong to ignore the clear indication that the trial judge was so influenced. As I pointed out in my dissent, after the appellee interjected the accusation that the appellant practiced Wicca, the trial judge interjected himself into the proceedings and began interrogating the appellant about that practice. If that was not a clear indication that the trial judge was extraordinarily concerned about the possibility that the appellant was practicing Wicca, it was certainly confirmed beyond any doubt by the fact that the trial judge made an explicit finding to that effect in his written order.

As I stated in my dissent, even if it were proven that the appellant was a practicing Wiccan, that conclusion can have no bearing on the decision to change custody. The majority makes a clear mistake of fact because there is absolutely no evidence that practicing Wicca was in any way harmful to the child or even that there were any practices conducted in the child's presence. Accordingly, this cannot be a reason for changing custody. The majority made a clear error of law by not holding that this case is controlled by *Taylor v. Taylor*, 353 Ark. 69, 110 S.W.3d 731 (2003) (reversing a custody award based on "perceptions and appearances rather than concrete proof of likely harm").

Finally, I am compelled to mention that the appellee's intemperate response to the appellant's rehearing petition was not only inappropriate but was vile and slanderous. He argues, among

other things, that the majority was correct to allow the trial court to make a custody decision based on his perception of the appellant's religious beliefs because not all religions are worthy of constitutional protection. He denigrates Mormons, asserting that "Mormons practice incest and child marriages," and proclaims that "Wicca is a cult, not a religious belief." He admonishes that "this court is committing a grievous error if it allows cult activities to be protected" and that the "trial judge appropriately ruled in this case after carefully considering the facts." In light of the appellee's further illumination of this issue, I simply cannot say that the trial court's decision was "appropriate." I lament that this court has accepted the appellee's invitation to embark on a grand inquisition.