2012 Ark. App. 212

**Larry Eugene MADISON and Misty Leigh Madison, Husband and Wife, and Miles Vernon Griffin, Appellants**

v.

**Ashley Dawn Turley OSBURN, Appellee.**

No. CA 11–223.

Court of Appeals of Arkansas.

March 14, 2012.

Brenda Dianne Austin, for appellant.

Mary Edwards Green, Fayetteville and William Marshall Prettyman, Jr., for appellee.

RAYMOND R. ABRAMSON, Judge.

Appellant Miles Griffin appeals from a Washington County Circuit Court order denying his request for visitation with his daughter, M.G., and ordering retroactive child support. He further argues that the trial court erred in setting the amount of child support without referencing the Arkansas Child Support Guidelines, without evidence of his actual income and circumstances, and without considering the best interests of the child. Appellants Larry and Misty Madison (Madisons) appeal the trial court's order denying their petition for guardianship of M.G. Appellee Ashley Osburn contends that the trial court was correct in those rulings but cross-appeals, asserting that the trial court erred in favoring an acknowledgment of paternity over scientific evidence and in granting grandparent-visitation rights to the Madisons.

M.G. was born on April 23, 2007. At the time of M.G.'s birth, Griffin and Osburn had been cohabitating for several months. Griffin and Osburn signed and filed an acknowledgment of paternity naming Griffin as the father of M.G. on April 25, 2007. Griffin's name was thereafter included on M.G.'s birth certificate.

Griffin and Osburn continued to cohabitate until their separation in the fall of 2007. While Griffin continued to see M.G. sporadically, his visitation was infrequent and his financial support was slight. The Madisons, however, were very involved in M.G.'s life and provided some financial support to Osburn. It is undisputed that the Madisons had a significant relationship with M.G. However, in February 2010, the Madisons' relationship with Osburn deteriorated, and Osburn refused to allow the Madisons any further contact with M.G.

The Madisons thereafter filed a petition for guardianship on March 23, 2010, alleging that they stood in loco parentis over M.G. and that Osburn was an unsuitable parent.[1] Osburn responded, denying Griffin was the biological father of M.G.

1. During this time, the Madisons, who had been Griffin's guardians during his minority,

On April 8, 2010, Griffin filed a petition to establish paternity, to set child support, and to grant visitation. Osburn filed an answer and, once again, denied Griffin's paternity. She also asserted that the paternity action had been brought in bad faith solely to further the Madisons' position in the guardianship action. She then filed a motion for DNA testing on June 23, 2010.

The paternity and guardianship actions were consolidated on June 28, 2010. On July 2, 2010, the Madisons filed a petition for grandparent visitation.[2] Osburn responded, again denying paternity and alleging fraud, mistake of fact in the acknowledgment of paternity, or both.

A hearing on Osburn's motion for DNA testing and the appellants' request for visitation was held on July 20, 2010. At the hearing, Griffin testified that he lived with Osburn for four or five months prior to M.G.'s birth. He stated that he was staying with Osburn's parents when Osburn got pregnant and that he had sexual relations with her around the time of M.G.'s conception. He stated that, at the time he signed the acknowledgment of paternity, he was not sure he was the father of the child, but that they both had a reason to believe he could be the father. He admitted subsequently signing an affidavit acknowledging he was not the biological father of M.G., but that he still considered himself her father and did not want DNA testing to be ordered that might eliminate him as her father.

Osburn testified that Griffin was present when M.G. was born and that he had signed the acknowledgment of paternity. She testified that she had had a caesarean section, was on morphine at the time she signed the acknowledgment, and had no recollection of signing it. She stated that, at the time of M.G.'s birth, she believed Jackey Bohanon to be the child's father and that she and Griffin had talked about it several times. She stated that Griffin told her that he signed the acknowledgment of paternity because he was scared and nervous and did not know what to do. She did not threaten or coerce Griffin to sign the acknowledgment. She further stated that, although her motion for DNA testing indicated that she believed Griffin was the father of M.G., that information was incorrect and had been completed by her attorney.

After hearing the testimony of the parties, the trial court denied Osburn's request for DNA testing on the basis that Osburn had failed to rescind the acknowledgment of paternity within the time allowed by law and that she had failed to prove fraud, duress, or material mistake of fact in the obtaining of the acknowledgment of paternity.[3] The trial court found Griffin to be the legal father of M G., encouraged Griffin to visit with M.G. during her visits with the Madisons, but denied him separate visitation with the child at that time.

The final hearing was held on September 10, 2010, and continued on October 5, 2010. At the hearing, Osburn submitted a DNA test that identified Jackey Bohanon as the probable father of M.G. The trial court admitted the DNA test into evidence for the sole purpose of assessing Osburn's credibility. Osburn admitted that the Madisons had a significant relationship with M.G. and that she had completely cut

filed a petition to adopt Griffin, which was granted in April 2010.

**2.** An amended petition was filed on July 7, 2010.

**3.** The temporary order was not filed until November 18, 2010—the same day as the final order.

off contact with the Madisons in February 2010. She stated that the Madisons were not M.G.'s grandparents and indicated that the Madisons had become overbearing and that the relationship was becoming unhealthy. There was also evidence admitted at the hearing that Osburn was distant from the child and was content to allow other people, including the Madisons, to parent the child. There was further evidence that Osburn had overnight male visitors and her mother had smoked |₅marijuana in the home. Because Griffin did not testify at the hearing on the merits,[4] there was no additional information regarding his financial condition presented.

At the close of the evidence, the trial court denied the petition for guardianship finding that the Madisons had failed to prove that Osburn was an unsuitable parent, but granted grandparent visitation. The court also ordered Griffin to pay $45 per week child support based upon an imputed income of minimum wage and entered a judgment for back support in the amount of $6,820. The trial court denied Griffin's request for visitation and stated that all back child support must be paid before visitation would be awarded.

The underlying issue upon which all but the guardianship claim relies is whether the trial court erred in finding that Griffin was the legal father of M.G. given that a subsequent DNA test confirmed that Griffin was not the biological father. Therefore, this issue must be resolved first.

## I. *Paternity*

██ Griffin filed a petition to establish paternity after Osburn denied his paternity in the guardianship action. Osburn thereafter sought a DNA test pursuant to Arkansas Code Annotated section 9–10–108(a)(1) (Repl.2009) to determine whether Griffin was the biological father of M.G. Arkansas Code Annotated section 9–10–108(a)(1) provides:

Upon motion of either party in a paternity action, the trial court shall order that the putative father, mother, and child submit to scientific testing for paternity, which may include deoxyribonucleic acid testing, to determine whether or not the putative father can be excluded as being the biological father of the child and to establish the probability of paternity if the testing does not exclude the putative father.

|₆The trial court denied the motion, finding that Griffin was the established legal father of M.G. based upon the unrescinded acknowledgment of paternity. The trial court was correct.

By signing and filing the acknowledgment of paternity, Griffin became the legal father of M.G. Arkansas Code Annotated sections 9–10–120(a) and (b) (Repl.2009) provide that "[a] man is the father of a child for all intents and purposes if he and the mother execute an acknowledgment of paternity of the child" and that "[a]cknowledgments of paternity shall by operation of law constitute a conclusive finding of paternity, subject to the modification of orders or judgments under § 9–10–115,[5] and shall be recognized by the chancery courts and juvenile divisions thereof as creating a parent and child relationship between father and child." As the legal father of

---

**4.** Griffin failed to attend the second day of the hearing because he experienced car trouble.

**5.** Arkansas Code Annotated section 9–10–115(d)(1) (Repl.2009) provides that "[b]eyond the sixty-day period or other limitation set forth in subsection (c) of this section, a person

may challenge a paternity establishment pursuant to a voluntary acknowledgment of paternity or an order based on an acknowledgment of paternity only upon an allegation of fraud, duress, or material mistake of fact."

M.G., there was no need for Griffin to establish paternity, and the DNA testing requirements under section 9–10–108(a)(1) were not applicable.

Rather, this was substantively an attempt by Osburn to rescind the acknowledgment of paternity. Because more than sixty days had passed since the acknowledgment was filed, Osburn was required to prove that the acknowledgment was procured by fraud, duress, or material mistake of fact. The trial court found that Osburn had failed in her burden of proving fraud or material mistake of fact.[6]

The elements of fraud are (1) a false representation of material fact; (2) knowledge that the representation is false or that there is insufficient evidence upon which to make the representation; (3) intent to induce action or inaction in reliance upon the representation; (4) justifiable reliance upon the representation; (5) damage suffered as a result of the reliance. *McAdams v. Ellington,* 333 Ark. 362, 970 S.W.2d 203 (1998) (citing *Scollard v. Scollard,* 329 Ark. 83, 947 S.W.2d 345 (1997)). Here, no fraud was perpetrated against Osburn. She testified that she signed the acknowledgment of paternity knowing that Griffin was not the father. Nor was there any fraud perpetrated against Griffin, because Osburn stated that she told Griffin that he was not M.G.'s father before the child was born. Moreover, there was no evidence of fraud against Jackey Bohanon, the person Osburn claimed was the father. Osburn testified that she told him he was M.G.'s father and he knew Griffin signed the acknowledgment of paternity.

Osburn also failed to prove a "mistake of fact." Both parties signed the acknowledgment knowing that either (1) Griffin was not the father, or (2) at the

very least, there was a chance he might not be. Thus, the parties were not mistaken as to any material fact when they signed the acknowledgment. Because Osburn failed to prove fraud or material mistake of fact in the acknowledgment of paternity, we hold that the trial court did not clearly err in refusing to allow Osburn to rescind her acknowledgment.

Osburn argues that the trial court should have considered the DNA test that established that Bohanon was the father of the child when determining paternity. However, that test was not available at the hearing in which paternity was established. But, even if the test had been available at that time, it would have had no bearing on the issue of whether the acknowledgment of paternity was based on fraud or material mistake of fact. Despite the knowledge that he may not be the biological father of the child, Griffin does not argue that he was defrauded into signing the acknowledgment of paternity and continues to assert the legal and financial responsibility for M.G. Osburn testified that she knew that Bohanon was the biological father when she signed the affidavit of paternity; thus the DNA test merely confirms this fact. It does not, however, prove fraud or mistake of fact, and is therefore irrelevant to the issue of whether the acknowledgment should be rescinded.

## II. *Visitation*

Griffin argues that the trial court erred in conditioning his visitation upon payment of back support. Arkansas Code Annotated section 9–10–114 (Repl.2009) provides that "[w]hen any circuit court in this state determines the paternity of a child and orders the father to make periodic pay-

---

**6.** Arkansas Code Annotated section 9–10–115(d)(2) (Repl.2009) provides that "[t]he burden of proof shall be upon the person challenging the establishment of paternity."

ments for support of the child, the court may also grant reasonable visitation rights to the father and may issue such orders as may be necessary to enforce the visitation rights." Thus, under the statute, the grant of visitation was discretionary for the court.

Here, the court did not abuse its discretion in denying visitation. Griffin had provided little financial support to M.G. after his separation from Osburn. It is also undisputed that his visitation with M.G. was sporadic. Nothing in the order prevents Griffin from exercising visitation with M.G. during her visits with the Madisons, and the trial judge encouraged him to do so. Osburn even testified that she was willing to allow M.G. to visit Griffin. Thus, nothing in this order prohibits Griffin from establishing a relationship with M.G. and then petitioning the court for a modification of visitation in the future.

However, we reverse the trial court's order making visitation contingent upon the payment of back child support. We hold that visitation should not be conditioned upon the payment of child support.

### III. *Child Support*

Griffin next argues that the trial court erred in awarding back child support when it had not been pled. Here, as the legal father of M.G., Griffin has the legal responsibility to provide financial support for the child. Therefore, we find no error in the trial court ordering back child support.

He also argues that the trial court erred in setting the amount of retroactive and prospective child support by failing to reference the child-support guidelines, by imputing income without sufficient evidence of his actual income and circum-

stances, and by failing to consider the best interests of the child.

Section (I) of Administrative Order 10 states that the circuit court's order "shall contain the court's determination of the payor's income, recite the amount of support required under the guidelines, and recite whether the court deviated from the Family Support Chart." Ark. Sup.Ct. Admin. Order No. 10(I). The circuit court's order does not contain a determination of Griffin's income, does not refer to the guidelines or the support amount required thereunder, and does not recite whether it deviated from the family-support chart. Therefore, we reverse and remand for further findings by the circuit court in compliance with Administrative Order No. 10.

### IV. *Guardianship*

The Madisons argue on appeal that the trial court erred in finding Osburn to be a suitable parent and in failing to establish a guardianship. A preference for the natural parent must prevail in third-party guardianship cases unless it is established that the natural parent is unfit. *See Robbins v. State*, 80 Ark.App. 204, 92 S.W.3d 707 (2002); *see also Dunham v. Doyle*, 84 Ark.App. 36, 129 S.W.3d 304 (2003) (stating that the law prefers a parent over a grandparent unless the parent is proved to be incompetent or unfit). The evidence in this case does not support a finding that Osburn was an unfit parent. While Osburn's conduct and lifestyle may not be ideal, there is no evidence that she is such an unfit parent that the child should be removed from her custody. As a result, the trial court did not err in denying the Madisons' petition for guardianship.

### V. *Grandparent Visitation*

On cross-appeal, Osburn argues that the trial court erred in granting

the Madisons grandparent-visitation rights. The fixing of visitation rights is a matter that lies within the sound discretion of the circuit court. *Hudson v. Kyle,* 365 Ark. 341, 229 S.W.3d 890 (2006). The main consideration in making judicial determinations concerning visitation is the best interest of the child. *Id.* Further, our appellate courts have traditionally reviewed matters that sounded in equity de novo on the record with respect to factual questions and legal questions. *Id.* We have stated repeatedly that we would not reverse a finding by a circuit court in an equity case unless it was clearly erroneous. *Id.* We have also stated that a finding of fact by a circuit court sitting in an equity case is clearly erroneous when, despite supporting evidence in the record, the appellate court viewing all of the evidence is left with a definite and firm conviction that a mistake has been committed. *Id.* In resolving the clearly erroneous question, we must give due regard to the opportunity of the court to judge the credibility of witnesses. *Id.* This deference to the circuit court is even greater in cases involving child custody or visitation, as a heavier burden is placed on the circuit court to utilize to the fullest extent its powers of perception in evaluating the witnesses, their testimony, and the best interest of the children. *Bethany v. Jones,* 2011 Ark. 67, 378 S.W.3d 731.

The Madisons sought grandparent-visitation rights under Arkansas Code Annotated section 9–13–103(b)–(e) (Repl.2009), which allows a grandparent to seek visitation with a grandchild upon a showing that there is a significant and viable relationship with the child and that such visitation is in the best interest of the child. The trial court granted visitation, finding that the Madisons had met their burden.

Here, Osburn alleges that the trial court unconstitutionally applied the grandparent-visitation statute in this case and that it erroneously determined that the Madisons had rebutted the presumption in favor of her decision to deny visitation.

As for the constitutionality argument, this argument was not made below. Even constitutional arguments must be raised below and cannot be advanced for the first time on appeal. *Doss v. Miller,* 2010 Ark. App. 95, 377 S.W.3d 348. Thus, we do not reach this argument.

Osburn next argues that the trial court erred in finding that the Madisons had rebutted the presumption that her decision denying or limiting visitation to them was in the best interest of the child. Here, Osburn does not deny that the Madisons had a significant and viable relationship with M.G. Rather, she argues that there was evidence that the Madisons would be unable to respect Osburn's role as the child's mother and that such evidence proved that the Madisons would be unable to cooperate with her if visitation was allowed.[7] However, while there was evidence of disagreement over parenting styles, there was no evidence that the Madisons did not cooperate with Osburn. Given the trial court's opportunity to judge the credibility of the witnesses, this determination was not clearly erroneous.

Affirmed in part and reversed in part on direct appeal; affirmed on cross-appeal.

ROBBINS and WYNNE, JJ., agree.

---

7. One of the statutory factors used in establishing that visitation is in the best interest of the child is whether the grandparent is willing to cooperate with the custodian if visitation with the child is allowed. Ark.Code Ann. § 9–13–103(e)(3) (Repl.2009).