2012 Ark. App. 582

**Sarah Jean MADDEN, Appellant**

v.

**Aaron MADDEN, Appellee.**

**No. CA 11–1230.**

Court of Appeals of Arkansas.

Oct. 24, 2012.

Rex W. Chronister, Fort Smith, and Megen C. Prewitt, for appellant.

Brent A. Hall, for appellee.

JOSEPHINE LINKER HART, Judge.

Sarah Jean Madden appeals from an order of the Sebastian County Circuit Court changing custody of her now eight-year-old daughter, B.M., to her ex-husband, Aaron Madden. On appeal, she argues that the trial court erred by finding (1) a material change of circumstances, (2) that it was in the child's best interest to change custody, and (3) failing to consider Aaron Madden's credibility. We affirm.

Sarah married Aaron on July 11, 2003, and lived with him until they separated on December 8, 2005. B.M. was born on August 30, 2004. While Sarah was married to Aaron, she had custody of two other children who are B.M.'s half-siblings, who, at the time of her mother's separation from Aaron, were ages four and six. As per their agreement, the parties' May 5, 2006 divorce decree awarded Sarah custody of B.M. subject to Aaron's visitation

every other weekend and every Wednesday.

On April 27, 2010, Aaron filed a petition seeking a change of custody and asking the trial court to find Sarah in contempt for violating the divorce decree. Aaron alleged that Sarah had "abandoned" B.M. by leaving her with Sarah's parents and was currently cohabitating with a romantic partner in the presence of the minor child when the child went to her residence on "weekend visits." Further, Aaron alleged that B.M. was not receiving appropriate medical care while in her grandparents' home, and B.M. lacked a "present, attentive parent to meet her physical, emotional, and educational needs." He also asserted that Sarah should be found in contempt for her refusal to disclose her true residences. Aaron obtained an ex parte order giving him temporary custody. Sarah did not oppose the order. B.M. remained in Aaron's custody through the petition's hearings, which began on April 14, 2011.[1]

Aaron testified that all the visitation exchanges took place in Van Buren at the home of Sarah's parents. Sarah was rarely present; he saw her approximately four to six times in a year. In November 2009, he surmised that Sarah no longer lived there. Subsequently, he spoke with David Cole, the father of one of Sarah's other children, who had also noticed the absence of Sarah at the visitation exchanges. Aaron then discovered from utility records that Sarah had a residence in Bentonville. Ultimately, he concluded that Sarah had left B.M. with her parents, and he sought a change of custody.

Aaron asserted that Sarah left B.M. with her parents for long periods of time when she moved to New York and to Bentonville. He noted that Sarah's other children were living with her parents when he married Sarah. Aaron complained that since their divorce, Sarah had not provided a home for her children and that she had lived away from them for several months at a time. She had also failed to provide health insurance for B.M. as required by the original custody order. By comparison, since his divorce, he never missed a single visit with his child, and he had been "physically and emotionally present" in his child's life at all times. He noted further that when he had attempted to communicate by telephone with B.M. while the child was in her mother's custody, he was never successful. Sarah would usually tell him that B.M. was asleep, even when it was 5:30 in the afternoon.

Aaron further testified that he maintained contact with B.M.'s teacher in the preschool program that she attended. He attended all of B.M.'s performances and her graduation, but he did not recall seeing Sarah in attendance. He claimed that he had a close relationship with his daughter in which he not only played with her, but also tended to her physical, medical, spiritual, and academic needs. According to Aaron, B.M. gets along well with his new wife's children, who are twelve and eleven years old. He also promotes B.M.'s contact with his extended family, which B.M. enjoys. Aaron stated that he had a stable job as a commercial plumber with set hours from 7:00 a.m. to 3:30 p.m., Monday through Friday, with no weekends, overtime, or late hours. He is required to be on call, but that is only one week out of six. His annual salary of $32,000 allows him to provide for B.M.

---

1. Notably, Sarah has two other children, by two other men, from two other marriages. Those other men, Gabriel Edmonds and David Cole, petitioned for change of custody at the same time that Aaron filed his petition. All three petitions were tried in the same proceeding.

financially. His routine involves picking B.M. up from the local Boys and Girls Club when he gets off from work, making dinner, and helping B.M. with her homework. Aside from the rare instances when he is called out on an after-hours service call—at which point B.M. would be in the care of his new spouse—he is physically present in his home anytime his child needs him.

On cross-examination, Aaron admitted that prior to his taking emergency custody of his daughter, she was clean, healthy, and doing well in school. He nonetheless stated that Sarah was not "a good mom," because she was not physically present and it was B.M.'s grandparents who were taking care of her. According to Aaron, save for the purchase of a single t-shirt, Sarah did not provide any financial support for B.M. during the year he had her pursuant to the ex parte custody order, yet he had paid all his child support. He also allowed B.M. to talk with Sarah by phone at least once or twice a week.

Shannon Davis, B.M.'s first grade teacher, testified that B.M. was an A student, with very good school attendance. Based on her test scores, B.M. was an average student. Davis stated that she got to know both of B.M.'s parents, but Aaron was far more involved in B.M.'s school activities. She stated that B.M. appeared to be a "generally happy child," who "does not seem to carry any weight or burdens." Regarding Sarah, Davis stated that she had met Sarah in person, had email contact with her, and did not have any "concerns" about her.

Gabriel Edmonds testified that he married Sarah on December 6, 1997, and they divorced on June 1, 2000. By agreement of the parties, Sarah got custody of M.E.E. He noted that all visitation exchanges took place at his child's grandparents' house for at least the last three or four years. According to Edmonds, Sarah was very rarely there—he estimated that he saw her more in the past year than he had in the previous eleven years combined. He stated that prior to M.E.E. getting her own telephone, communication with his daughter while she was in her mother's custody was "nearly impossible." Edmonds asserted that since 2008, Sarah had not provided a home for M.E.E., and that she refused to tell him where she was living. He noted that he did a Google search and discovered a listing for Sarah Madden Photography in Bentonville. Her website included pictures of all three children. Edmonds also discovered career links and online resumes stating that Sarah lived in Valley Cottage, New York, and a gay-rights petition that listed Sarah's address as Bentonville.

David Cole testified that he was married to Sarah on August 26, 2000, and divorced on September 30, 2002. By agreement of the parties, Sarah got custody of J.C., who at the time of the divorce, was just over a year old. He asserted that Sarah had not provided a home for her children and was not physically present in their lives for much of the time. He claimed that J.C. had been living with his grandparents "forever." Cole stated that all the visitation exchanges took place at the grandparents' house, and J.C. stated that he was living with them. He noted that Sarah seemed to have relationships that were "two-year cycles," which have been emotionally difficult for J.C. Cole asserted that, since obtaining temporary custody of J.C., he had facilitated contact between his child and the other half-siblings, and he pledged to continue to do so if he was granted permanent custody.

All three of the children testified. B.M. stated that the temporary-custody arrangement was going well and that she would be happy living with either her

mother or her father. She stated that she did not want to pick, but, without being able to give a reason, testified that she preferred living with her mother. She thought she got along with her stepbrother and stepsister equally well with how she got along with M.E.E. and J.C. B.M. denied that her mother lived in New York, but confirmed that Sarah lived in Bentonville with Jen "for awhile." She noted that her mother was present when she went to bed, but only "sometimes."

J.C. testified similarly. He stated that he did well living with his father as well as living with his mother. He noted that there were times when his mother was not around, but denied knowing anything about Sarah living in New York. He also stated that, for a time, Sarah lived in Bentonville with Jen. J.C. stated that he preferred to live with his mother because he missed his half-siblings.

M.E.E. testified that she desired to live with her mother because she wanted to be united with her half-siblings. She noted that her father and his wife were in the process of getting a divorce. She denied living at her grandparents' house, asserting that she stayed there only when her mother went to work. According to M.E.E., her mother only went to New York "for a vacation." She also claimed that her mother "didn't really ever live in Bentonville."

Michelle Madden, Aaron's new wife, testified that she had a good relationship with B.M. She stated that she had never met Sarah and only saw her at visitation exchanges a few times over a more than three-year period. She admitted that she lived with Aaron after they got engaged, but regretted that moral lapse. Michelle testified that the family regularly attends church. Michelle noted that telephone communication with B.M. was very difficult when Sarah had custody. Since Aaron obtained temporary custody, Michelle stated that they have facilitated contact with J.C. so that B.M. could maintain a relationship with her half-sibling.

Sarah denied that she ever resided in Bentonville. She claimed that she signed an apartment lease in April 2009 for her girlfriend, Jen, who at the time was busy taking nursing boards in New York. She claimed that she lived with her parents and visited Jen only on the weekends and occasionally during the week. When confronted by the utility bills, the gay-rights petition, the apartment lease, and her photography-business website, she asserted that she was not being truthful when she represented that she resided in Bentonville—she called them "pure lies"—but insisted that she was telling the truth in court. She was also confronted with a second lease in December 2009, after Jen had already relocated to Bentonville. Sarah asserted that she did not live in that apartment either. She similarly dismissed her signature on the application for utilities at the new apartment. She also testified that during the visitation exchanges, she was dropping off one or more of her children and merely left one or more of the others to be picked up at her parents' house.

Sarah testified that she regretted her decision to go to New York. She claimed that her motivation for going there was to find a higher-paying job after she was laid off from Auto Master. She hoped that her employment in New York would enable her to keep the house on Quarry Road in Van Buren and retire some credit-card debt. Sarah admitted that she spent a total of six months in New York, but claimed that she returned to Van Buren to visit her children three times. She also admitted that she never informed the fathers of the move, but denied ever telling the children to lie about her residence.

She acknowledged that she did not divulge her change of residence to the fathers because she feared a custody battle.

Sarah asserted that she had custody of the children for their entire lives and that they have always done well in school. She stated that since J.C. and B.M. were in the custody of their fathers, she noted a change in their personalities. B.M. had become "cold" and J.C. had become "an angry boy." Sarah claimed that the children have expressed regret about not living with their other half-siblings. According to Sarah, she currently resided at a townhouse in Van Buren, having moved there directly from her parents' house. After returning from New York, she accepted short-term employment in Fayetteville and Bentonville, but merely commuted to these jobs. Most recently, she worked for the post office in Van Buren, but she terminated her employment because she anticipated that her position would be moved to Fayetteville. Sarah stated that she is currently unemployed, but maintains her apartment because she is in a "committed, serious relationship" with Jen. Jen makes $70,000 and takes care of her bills even though they do not currently live together.

Sarah's mother, Jan Evans, testified that the children had always lived with their mother; she only babysat them. She claimed that the fathers would pick up the children at her home because it was "simpler." Jan also claimed that she would wait for Aaron to drop off B.M. while Sarah and Sarah's father would pick up the other two children. Jan stated that Sarah's move to New York was prompted by her desire to save her home. She asserted that the fathers never asked where Sarah was. Jan admitted that Sarah leased an apartment in Bentonville when she returned from New York, but claimed that Sarah continued to live with her and the children in Van Buren. She did note that Sarah visited Jen every weekend and sometimes during the week. She asserted that Sarah "handled the mothering and the parenting." Jan also claimed that the attitudes of J.C. and B.M. had changed since they were in their fathers' custody, and M.E.E. seemed "lonely."

Robert Baker Evans, Sr., Sarah's father, also testified that Sarah never left the children at his home to be cared for. Regarding picking up the children, he claimed that Sarah would pick up one and he would pick up the other, while his wife waited at home for the third. When Sarah went to New York, he would pick up one, while Jan picked up the other, and Aaron dropped off B.M. He also claimed that Sarah never lived in Bentonville but would usually visit on the weekends. He stated that Sarah was currently living in her own apartment in Van Buren. He also opined that the children had "changed drastically physically and mentally." M.E.E. was depressed, J.C. was "very angry and rebellious," and, although B.M. seemed "normal," he had observed her crying for her sister.

Jennifer "Jen" Sarrubbo testified that she lives in Van Buren at a different address than Sarah. She stated that she met Sarah online while she was living in New York. Jen asserted that she was in a "committed" relationship with Sarah; although Arkansas does not recognize the union, she married Sarah in Iowa. Jen confirmed that Sarah lived with her in New York for six months, but claimed that Sarah was trying to "save her house for her and the kids." She introduced checks showing that she had paid the utility bills for the Bentonville apartment. She claimed that she had a very good relationship with Sarah's children and that the children did not question her relationship with Sarah. She also tes-

tified that the children acted differently since the fathers had obtained temporary custody. Jen confirmed that Sarah was not currently employed, but stated that they shared her income and the apartment was paid for out of a "joint account."

The trial court found that there had been a material change in circumstances. It made the following findings:

a. The Plaintiff has engaged in numerous short-lived relationships and marriages;

b. The Plaintiff has failed to maintain a residence of her own;

c. The Plaintiff has had her children reside in the care of her parents;

d. The Plaintiff moved to New York in 2008 without the children and lived there for a period of six (6) months;

e. The Plaintiff failed to notify the Defendant of her move to New York;

f. The Plaintiff is engaged in a homosexual relationship of which the children are not fully aware and do not understand; and

g. The Plaintiff rented an apartment in Bentonville, Arkansas and established utility served [sic] at the residence in or about April 2009 while the children remained in the care of her parents in Van Buren, Arkansas.

The trial court then found it was in the best interest of B.M. to be placed in Aaron's custody. The trial court's findings included Sarah's lack of stability evidenced by her "multiple, shortlived relationships; failure to maintain her own residence; inconsistent and short-lived employment, and entry into a homosexual marriage not recognized by the State of Arkansas." It also found that while the child resided with Aaron for over a year pursuant to the temporary-custody order, she was "happy and well adjusted." Additionally, the trial court found that Aaron was stable and in a stable relationship. Sarah timely filed a notice of appeal.

At the outset, we acknowledge that it is axiomatic that the primary consideration in child-custody cases is the welfare and best interest of the children; all other considerations are secondary. *Alphin v. Alphin*, 364 Ark. 332, 219 S.W.3d 160 (2005). A judicial award of custody should not be modified unless it is shown that there are changed conditions that demonstrate that a modification of the decree is in the best interest of the child, or when there is a showing of facts affecting the best interest of the child that were either not presented to the trial court or were not known by the trial court at the time the original custody order was entered. *Id.* Generally, courts impose more stringent standards for modifications in custody than they do for initial determinations of custody. *Id.* The reasons for requiring these more stringent standards for modifications than for initial custody determinations are to promote stability and continuity in the life of the child and to discourage the repeated litigation of the same issues. *Id.*

Sarah first argues that the trial court erred when it found a material change of circumstances based on a change in her behavior. She contends that her temperament and intention to use her parents' house for visitation exchanges existed at the time she was awarded initial custody. We disagree.

Sarah's argument concedes the undisputed fact that she left her children in the care of her parents for six months while she moved to New York, but asserts, without any authority that this action was "moot." She similarly fails to properly address the trial court's finding that she continued to leave her children with her parents while she rented an apartment in Bentonville. Although she couches this

portion of her argument in terms of there being insufficient proof to support this finding, we disagree. We acknowledge that she disputed the proof presented by Aaron, but given our deference to the superior position of the trial court to determine the credibility of witnesses, we cannot say that this finding is clearly against the preponderance of the evidence. We hold that the trial court did not err in finding a material change of circumstances.

Sarah next argues that it was not in the child's best interest to change custody when it was not shown how any changes in her situation had affected or would affect the child. She asserts that even if it were true that she had "multiple short-lived relationships," there was no evidence that they harmed the child. She notes that B.M. performed well on standardized tests, and she introduced pictures of herself interacting with a happy child. Further, citing *Middleton v. Middleton*, 83 Ark. App. 7, 113 S.W.3d 625 (2003), she asserts that Aaron's "now stable lifestyle" cannot alone be the basis for justifying a change in custody. However, while she concedes that Aaron's job and marriage may be "considered globally" with other factors, they do not "carry enough weight" to justify a change of custody. Sarah also argues that the trial court should have given B.M.'s relationship with her half-siblings "more weight" given the fact the three children were raised together. While she acknowledges that in *Atkinson v. Atkinson*, 72 Ark.App. 15, 32 S.W.3d 41 (2000), this court held that keeping siblings together cannot be the sole reason for a custody decision, and that in *Eaton v. Dixon*, 69 Ark.App. 9, 9 S.W.3d 535 (2000), we said that the prohibition against separating siblings absent exceptional circumstances does not apply with equal force to half-siblings, she nonetheless argues that "the effect of tearing a family apart must carry some weight in this case." We find this argument unconvincing.

The issue in this case is whether it was in B.M.'s best interest to be placed in the custody of a full-time natural parent, or with one who has repeatedly shown that she would leave her children with their grandparents so that she could further her own romantic interests. While we do not intend to in any way disparage the effort put forth by Jan and Robert Evans in raising Sarah's children, the fact remains that Sarah chose to absent herself from her children for at least weeks at a time, interrupting her new life only for weekend visits with her children. The law presumes that a fit, natural parent should have custody of his or her children, rather than the children's grandparents. *See Munn v. Hudson*, 2011 Ark. App. 775, 2011 WL 6226117.

We are mindful that the trial court's custody decision will significantly affect a very bonded group of half-siblings. Certainly this fact weighed against the change of custody. However, we must assume that the testimony of the fathers that they were sensitive to this fact and had made efforts to maintain contact between the half-siblings was properly weighed by the trial court.

Finally, Sarah argues that the trial court failed to properly consider Aaron's credibility. While she notes several points where the trial court could have found Aaron less than credible, we are not persuaded. In the first place, as noted previously, we generally defer to the trial court's superior position to determine the credibility of a witness in child-custody cases. More importantly, however, this case did not turn on Aaron's credibility but the credibility of Sarah and her parents. Despite initially trying to minimize the amount of time she was away from her

children, when confronted by contrary evidence, Sarah conceded that she left her children with her parents to move to New York. Likewise, regarding what appears to be a similar abandonment of her children when she moved to Bentonville, the trial court had to decide between her denials in court, albeit corroborated by her parents, and the contrary representations that she had made on the business website, gay-rights petition, apartment lease, and utility bills, in addition to the testimony of her own children, J.C. and B.M.

Affirmed.

WYNNE and GRUBER, JJ., agree.