Cite as 2025 Ark. App. 105

# ARKANSAS COURT OF APPEALS

DIVISION I
No. CV-23-806

| | |
|---|---|
| | **Opinion Delivered** February 19, 2025 |
| LONDEN BIGGERSTAFF | APPEAL FROM THE SEBASTIAN |
| APPELLANT | COUNTY CIRCUIT COURT, |
| | GREENWOOD DISTRICT |
| V. | [NO. 66GDR-17-268] |
| | |
| | HONORABLE SHANNON L. BLATT, |
| LEVI BIGGERSTAFF | JUDGE |
| APPELLEE | |
| | AFFIRMED |

**KENNETH S. HIXSON, Judge**

Appellant Londen Biggerstaff (Londen) appeals from the Sebastian County Circuit

Court's order granting a motion for change of custody and awarding appellee Levi Biggerstaff

(Levi) custody of the parties' minor children.  On appeal, Londen contends that (1) the

circuit court clearly erred by finding that a material change in circumstances had occurred

since the divorce when the uncontroverted evidence showed that she had addressed her

mental-health issues and the alleged instability in her home, and (2) the circuit court clearly

erred by finding that it was in the children's best interest to live with Levi without considering

all the relevant factors in its best-interest analysis.  We affirm.

I.  *Relevant Facts*

The parties were married on October 7, 2016, and have two children, Minor Child 1

(MC1) and Minor Child 2 (MC2).  A decree of divorce was filed on November 28, 2017.

The decree awarded custody of both children, ages five years and fourteen months at the time, to Londen. Levi was awarded visitation and ordered to pay child support.

On November 17, 2022, Levi filed a petition for an ex parte order granting him emergency temporary custody of the children. In his emergency petition, Levi explained that he had been notified of an Arkansas Department of Human Services (DHS) investigation regarding domestic violence in the home between Londen and her boyfriend and that there had been frequent disruptions to the children's living situation because of the altercations. He further alleged that Londen was "mentally unstable to have custody of the children." He stated that emergency responders had been dispatched to Londen's home on November 12–13, 2022, because Londen was suicidal and/or mentally unstable. MC1 had called Levi to pick him up multiple times because of the incidents, but Londen withheld his visitation, took him off the school pick-up list, and made threats against his nursing license. Finally, Levi alleged that Londen had been nonresponsive to school officials during the 2022–2023 school year, failed to consistently give MC2 her medication, and she and the children had lived in three different homes and switched school districts four times since the divorce.

On November 21, 2022, the circuit court granted Levi emergency temporary custody and granted Londen supervised visitation until a hearing could be held. A hearing was subsequently held on November 28, 2022.

At the hearing, MC1 was called as the first witness. Levi agreed to leave the courtroom during MC1's testimony, and Londen refused to do so. Accordingly, she remained in the courtroom during MC1's testimony. MC1, ten years old at the time, stated

2

that he was scared over the weekend of November 12, 2022, because his mother was on the floor screaming that she needed medical help. Londen told him she was having a mental breakdown. MC1 called Levi and then 911, after which the police came to the home. MC1 said that his younger sister, MC2; younger half brother, Minor Child 3 (MC3); and Londen's boyfriend, Adam Jones, whom he identified as his "stepdad," were also home at the time. MC1 could not remember if Adam's older daughter, Minor Child 4 (MC4), was also there. MC1 stated that after the police left, he tried to talk to Londen about his desire to move in with Levi but that Londen would not stop crying when he did.

MC1 recalled that the police and an ambulance had also been called to Londen's home before the November incident. On that occasion, he remembered seeing Londen on the floor screaming that she was suicidal. He also saw a "suicide card" lying on the floor next to her.

MC1 testified that Londen and Adam, Londen's boyfriend, do not get along. He explained that they scream at one another, call each other "bad names," and fight all the time. MC1 said that he also saw them hit one another. MC1 said that he saw a knife that had been left outside Londen's bedroom door. MC1 claimed that family members would pick him up sometimes when Londen and Adam fought. He further explained that Londen and Adam would take his cell phone away when they fought so that he could not call anyone. When MC1 was asked whether either parent spoke to him about testifying, MC1 said that Levi told him to tell the truth, and his mother said, "Please don't do this to me. I love you so much and please don't move away from me. And your dad's trying to take me away from

3

you – or take you away from me." MC1 said that he did not feel safe at Londen's home and that he was telling the truth.

Levi testified that on November 12, 2022, he was on the phone with MC1 when he heard Londen calling for help. MC1 told him that Adam was just standing and looking at her, so MC1 called 911. When Levi spoke to MC1 later that night, MC1 told him he wanted to move in with him. Levi could hear Londen crying and begging him not to take the children away. Levi said he tried to reach an agreement with Londen, but Londen refused. As a result, he filed the emergency petition. Londen had admitted to Levi that she was having mental-health issues, and Adam had called him to pick up the children on a couple of occasions because Londen's depression had gotten "so bad." He said that on one occasion, Adam had called him to pick up the children. However, Londen later told Levi not to pick the children up and that she was going to her grandmother's home with the children instead. At that time, Londen told Levi that her "anxiety and Adam's anxiety and anger do not mesh well."

Levi said that after the November incident, Londen took MC1's phone and texted Levi to not contact MC1 on his phone anymore and accused him of manipulating MC1. Levi was also removed from the "Life360 app" and the school contact list. Levi admitted that he was notified by the school that he was finally added back to the list the day of the hearing. Levi recalled another occasion in which he was dropping something off at Londen's house, and the children came to the door and were visibly upset. Through texts, Londen

gave Levi permission to take them out and eventually told him to take the children home with him until Adam could pick them up later.

Levi admitted that he has two other children from a previous marriage who had recently been adopted by his first wife's new spouse. He further admitted he had messed up and failed to fight for those children like he should have because he wanted to avoid confrontation with his first wife. He explained that he had learned his lesson and wanted to make sure he did not make the same mistake. Levi testified that he is a registered nurse and wanted to relocate to Owosso, Oklahoma, because he accepted a chief-nursing-officer position. Levi stated that he had married Kaylee Biggerstaff approximately a year before the hearing.

On cross-examination, Levi admitted that he thought Londen had depression issues during their marriage but could not diagnose her because he is not a doctor. He also admitted that he was not aware of either Adam or Londen being arrested for domestic violence. Levi testified that there was another incident in 2019 during which MC2 had drunk a bottle of Benadryl while in Londen's care and had to be airlifted to the hospital. Levi stated that he did not understand why Londen denied the allegation in her answer to his pleading, especially since she had posted about the incident on Facebook.

Kaylee Biggerstaff, Levi's new wife, testified that she had no concerns about Levi's mental health. She explained that they had been married for over a year, had been in a relationship for approximately four years, and have a normal relationship.

5

Londen testified and admitted that she made a Facebook post with a picture of MC2 in a hospital bed stating that "yesterday," MC2 drank a bottle of Benadryl and had to be airlifted to the hospital. A copy of the post was introduced into evidence. Despite her post stating otherwise, Londen testified at the hearing that it had been determined that MC2 had not consumed any Benadryl.

Londen admitted she had "meltdown[s]" on September 2, 2022, and on November 12, 2022. She explained that she has struggled with her mental health after she suffered from an ectopic pregnancy in late 2020. She also said she did not trust medications because Levi had written her several different prescriptions for antidepressants and benzodiazepines from a stolen prescription pad, even though he denies that he did so. Although Londen admitted that she struggled with her mental health, she denied that she could not take care of the children. She denied that there was any physical violence in the home. She admitted that the police had come to the home during the September and November incidents but said that no ambulances had to be called after she "confided" about her experience to the police. She said that MC1 should not have called the police during the November incident. She further complained that Levi should have checked with her first before telling MC1 to call the police.

Londen testified that she was attending nursing school and worked as a leasing agent. She said that the children were in extracurricular activities and that there was "always something going on after school." She explained that MC1 joined the archery team, MC3 was in "extensive therapy" for delays, and MC4 was in volleyball. Londen admitted that she

had forgotten to give MC2 her ADHD medication on two occasions before school, but she said she has four children that have to "get out the door pretty fast" in the mornings. That said, Londen explained that she has left extra medication at the school for the nurses to administer if she forgets.

Londen opined that Levi coached MC1 to testify as he did. She said she had never gotten into a physical altercation with Adam and that she was not aware of any knife being left outside her room. She also denied that family members had to pick up the children because of fighting. Regarding the time that Levi testified he took the children, Londen stated there was no fighting that day and that she was simply having a bad day because she had a lot of homework to do.

On cross-examination, Londen admitted that DHS had met with her to check on her mental health. She denied that there were any concerns of domestic violence and denied that it was an "investigation." She said DHS called it "[a] glorified wellness check." Londen admitted that she was on several medications and said that she had been seeing a psychiatrist until she stopped going in either September or October 2022. That psychiatrist had "newly diagnosed [her] with depression around March [2022]." She did, however, say she had asked her primary-care doctor to make a referral for a virtual counselor. Londen denied that she had attempted suicide on September 2, 2022. She admitted that Adam may have been concerned that she did because there was an empty pill bottle next to her. Although she admitted that MC1 testified that he did not feel safe with her, she explained that he does

7

not feel that way and was being manipulated by Levi. She further explained that for over a week, she had not had an opportunity to talk to MC1 without Levi being in the background.

Adam Jones testified that Londen and he have been in a relationship for five years and have a three-year-old child together, MC3. He said that he also has a fifteen-year-old daughter, MC4, from a previous relationship, and although MC4's mother has sole custody of MC4, MC4 lived with him most of the time. Therefore, Londen and the four children live with him in a home that Londen and he had recently purchased in Van Buren, Arkansas. Adam admitted that even though MC1 did not get along with him at first, the two of them had "come a long way," and more recently, they "get along really well."

Adam testified that on November 12, 2022, Londen experienced a panic attack. He said he tried to calm her down and told her to sit and relax. He testified that he also tried to console MC1 and let him know what was going on; however, MC1 called the police. Adam admitted that he had called Levi in the past about issues in the home. He explained that he had texted Levi in May 2022 to let him know that Londen was struggling with mental illness and asked him to pick up the children to allow him to give his full attention to Londen during an "episode." Adam said the episodes came in waves but averaged about one or two a month since her ectopic pregnancy in late 2020. During the episodes, Londen "kind of just shuts down." Adam was concerned that Londen had attempted to commit suicide on September 2, 2022, because he found a pill bottle during an episode. He later determined that she did not because she spoke normally after police had arrived at the scene. He denied

8

that Londen had told him she was suicidal at the time. Adam testified that he believes it is safe for the children to be at home because he is "always present."

After the hearing, the circuit court filed an order appointing attorney ad litem Richard Strunks for the children on November 28, 2022. A temporary order awarding Levi custody of the children and allowing him to relocate to Oklahoma with the minor children pending a final hearing was filed on December 5, 2022. In the order, the circuit court found the allegations set forth in the emergency petition true and stated that it was concerned about Londen's mental health and stability. It awarded Londen supervised visitation every other weekend—to be supervised by Londen's mother or grandmother—to ensure that Londen was "appropriate with the minor children and is mentally and emotionally stable at all times during visitation." The order further stated that the parties could agree on additional visitation and that the parties were to follow any recommendations of the attorney ad litem regarding visitation pending the final hearing.

Levi filed his petition for change of custody and authority to relocate with the minor children on December 9, 2022. He repeated the same allegations as he did in the emergency petition. He further alleged that he could provide "an appropriate, wholesome, and stable environment for the minor children and is financially, physically, and emotionally able to care for the minor children and has built a loving, stable, positive relationship with the minor children." He also explained that he intended to permanently relocate to Oklahoma for a new job that would be a promotion from his previous job and included a substantial raise

and additional opportunities for advancement in his career. As such, he asked the court to allow him to relocate with the children.

Londen generally denied that there had been a material change in circumstances or that it was in the children's best interest for Levi to have custody of them. She alleged that the temporary condition identified in the temporary order had been "fully addressed."

After multiple continuances, a final hearing was held on August 4, 2023. Officer Jose Hernandez testified that he was dispatched to Londen's home on September 2, 2022. He said that Londen appeared emotional and distraught. He explained that Adam told him Londen was suicidal and had left a suicide note. Officer Hernandez read the suicide note and discussed having EMS check her out. Londen admitted to him that she was suicidal but did not want any help after he offered her resources for treatment. He thought Adam and Londen had been arguing and drinking throughout the day. After making arrangements for someone to take care of MC3, whom he saw at the home, Officer Hernandez left. Officer Hernandez admitted that he did not feel comfortable leaving any child in that situation, but he did not have the authority to force them to make a child leave the home.

Officer Otis Charles Hester II testified that he was also dispatched to Londen's home on September 2, 2022, as backup. Officer Hester explained that Londen told him she was upset because she and Adam had been arguing most of the day. Londen further told him she was not suicidal but said that she and Adam were in an abusive relationship. She recalled incidents during which Adam had pushed her, causing bruising, and knocked her down, causing her to break her tailbone. Londen had emailed him a link with documentation to

10

support her allegations, but he was unable to open it because the link took him to a personal health portal that required a password. Officer Hester stated that he remembered two children being at the home, one of them being about ten years old. Arrangements were made for the children to go somewhere else, and Adam and Londen said they would leave each other alone.

Londen testified that the note the officers were referring to was not actually a suicide note. Instead, she claimed that it was a journal entry that she felt was therapeutic. The note was introduced into evidence without objection. Londen admitted that she told the officers she was suicidal and that there was domestic violence; however, she claimed that she had "simply lied that day." She further admitted that she was "out of control" during the September and November 2022 incidents, but she said she has been seeing a therapist since the last court hearing. Londen claimed that she has been able to "cope and deal with everything" after those two isolated incidents. Londen again denied that she and Adam would scream at each other, hit each other, or take away MC1's phone so he could not call anyone. She instead claimed that Levi had encouraged MC1 to "embellish" things and that MC1 had been deposed after he was in her care. She claimed that MC1 said in the deposition that Levi had told him to testify in a certain way. She said she and Adam had gone to counseling a couple times and have made attempts to resolve their issues. Londen also admitted that her family has encouraged her to leave Adam.

Rhonda Sprayberry, Londen's grandmother, testified that she had voiced some concerns to Levi in a recorded call about Londen's relationship with Adam. She admitted

she had said that the situation at the home had been bad, she had been at the home when Londen was having panic attacks, and she had overheard Londen saying she was suicidal. Rhonda further admitted that she told Levi that Adam was verbally abusive, that there were issues almost every weekend, and that Londen needed to leave Adam. Although Rhonda admitted that it was not healthy for the children to witness the issues between Londen and Adam, she did not think the children were ever in any danger. Rhonda thought that since the last hearing, Adam and Londen had addressed the issues of concern. When pressed further, Rhonda admitted that Londen has suffered with mental-health issues for years and that she thought she could resolve the issues with "continued counseling."

Erin Grude, Londen's mother, testified that she also had voiced her concerns in a recorded call to Levi after he had filed the emergency petition. During that call, Erin told Levi that she knew MC1 had told Levi about the September 2, 2022, suicide attempt and that she did not blame Levi for trying to get custody of the children. Although Erin admitted that she told Levi on the call that she wanted Adam out of the picture, Erin testified that she did not have any true concerns but just said that to be agreeable and to keep him on the phone. Erin said she was not aware of any more fighting or disharmony between Adam and Londen since the last hearing. She thought the children appeared to be happy and felt safe while in Londen's care.

Levi testified that he is a chief nursing officer in Owasso, Oklahoma. He repeated some of the same testimony that he gave at the temporary hearing. Levi denied that he had ever coached MC1 to tell the court or the attorney ad litem anything and that the only thing

he had ever told MC1 was to tell the truth. He explained that MC1 had spent much of the summer with Londen following the attorney ad litem's recommendation that Londen receive additional visitation.

Levi testified that he is happy that Londen is in therapy and receiving help. However, he still had concerns because he knows people behave differently "when they're being watched." He was also concerned because the therapy notes did not show any discussions about the domestic violence or the suicidal ideations. He did not think Adam and Londen had a stable relationship. Londen had told him there were times when the two of them separated and Londen stayed at her grandmother's house after an argument. On cross-examination, Levi admitted that he did not have any evidence of "meltdowns or problems or problems with suicidal ideations, or any mental health issues, for [Londen] since last November since she's been in counseling[.]"

Levi expressed some concerns that Londen had been trying to manipulate the children. He said he could tell a difference in the children's behavior toward him after the children had been in her care for more than a couple of days. Londen sent over two hundred pictures of the children from their past via text and sent a jacket with her perfume on it when they were in his custody to remind them of her. He said the children did not ask for them, but Londen said they needed them for "separation anxiety." Levi said the children had been doing well in his care and that both of them got student-of-the-month awards in two separate months. Levi explained that he sent a message to Londen about it and told her that it was

13

supposed to be a surprise for the children. However, Londen told MC2 about it, and when Levi confronted her, she told him it had just slipped out.

Kaylee testified that she has never had any concerns about Levi's mental health. She said they encourage the children to call Londen when the children are in their care.

After Levi rested his case, Londen called her therapist, Darlene Cantu, as a witness. Ms. Cantu testified that she had been seeing Londen weekly since January 18, 2023, and Ms. Cantu's progress notes were admitted into evidence without objection. She explained that she was working on educating Londen "to her body's responses to stresses in her life so that she is able to maintain a clear, level head, take a step back from situations, and use all the skills she's been taught, and she's had to demonstrate them regularly." She was also working to improve Londen's communication with her children about her mental health. Ms. Cantu said she was helping Londen recognize the symptoms of her panic attacks to help her stop them and "prevent a large episode from happening." She explained that this had been "a work in progress" and that they discuss situations that caused "big emotional dysregulation" at their weekly sessions. When Ms. Cantu was asked whether she felt that Londen has demonstrated the skills to have her children back, she stated the following:

> She has demonstrated usage of skills. She has demonstrated several very emotional situations, such as even court being postponed, being able to deal with the frustrations, being able to deal with that aggravation. She's demonstrated using -- reaching out to her support system, as well as using skills for herself, talking to the kids, being very open and honest with all the feelings that are involved in it, and has demonstrated control.
>
> Yes, she was frustrated. Yes, she was aggravated. But she was able to express those with her words with journaling, with some of the different homework activities,

14

like the feelings wheels, and show that she does have the skills and techniques available, and she utilizes them daily.

On cross-examination, Ms. Cantu stated that Londen had admitted that there had been an incident in September 2022 in which a note was misconstrued as a suicide note. Ms. Cantu explained that she had read the letter and could not say whether it was a suicide note. She also said Londen had not disclosed that she had told the police she was in an abusive relationship with Adam on September 2, 2022. Ms. Cantu explained that the only thing that had been discussed about Londen's relationship with Adam was how it was "pretty much in a standstill while they're waiting for all these court proceedings to complete so they know what direction to go and steps to take to improve their relationship." She had never met Adam, and she admitted that her only knowledge of their history was from Londen. Ms. Cantu did offer that if Londen had reported domestic violence, she would refer Londen and Adam to couples counseling. She admitted that Londen was not in couples counseling at that time.

Although Londen had not reported active suicidal ideation to her, Ms. Cantu admitted that does not mean it has not occurred. She acknowledged that it was a possibility that Londen just has not reported it and explained that every patient has the ability to lie to their therapist. Ms. Cantu testified that a "mental health episode" can be very different from person to person. It could mean that a person is yelling, screaming, or crying or that a person is isolating, crawling in bed, or rocking in a corner. Therefore, she uses the term "mental health episode" to mean that a person is in a "fragile state mental health wise at the time."

15

When the circuit court asked Ms. Cantu why the progress notes stated an estimated time for treatment to be three months each time, Ms. Cantu stated that her computer program's drop-down menu only gives an option for one, two, or three months. She explained that treatment time varies, but she starts at three months. In Londen's case, she said their goals had stayed the same throughout and that she was still making progress toward those goals. Ms. Cantu opined that she had at least three more months of treatment if she continued to make progress. That said, Londen had already indicated that she wanted to continue her therapy to develop more skills that she can use in her life.

Adam's testimony was similar to his testimony at the temporary hearing. Adam again denied that he had been physically abusive toward Londen. He acknowledged that she made the allegation against him according to the September 2022 police report; he said they have had discussions about it. He said she "probably felt like [he had] betrayed her" because he called the police, and her reaction to the situation was to falsely tell the police he was abusive. Although he denied the verbal abuse, Adam acknowledged that they have gotten into arguments, which probably had been "immature in nature."

Adam clarified that when he had previously testified at the temporary hearing that Londen had two or three episodes a month, those episodes were not the same as the "isolated events" that occurred in September and November 2022. He explained the other episodes occurred when Londen felt anxiety or the "notion of panic," but they did not rise to the level that police had to be called. He agreed that Londen's problems began in about 2021 and grew progressively worse. He denied that Londen had any "meltdowns" since November

16

2022. Although they had not attended couples therapy, Adam stated that Ms. Cantu's suggestions had been helpful. He explained that he talks with Londen every morning to check in with her and determine whether plans need to be adjusted depending on whether she was having a bad day.

MC1 testified that he remembered his testimony at the temporary hearing. He claimed that he had lied during that hearing about feeling unsafe at his mother's home because Levi had told him to do so. He said that things were not as bad as he had said and claimed that he was not afraid of Adam. He denied that Londen and Adam yelled at each other.

On cross-examination, MC1 admitted that he had told the court that he was telling the truth at the temporary hearing. He further admitted that his testimony that day differed from both his testimony at the temporary hearing and from his testimony at a deposition taken after the temporary hearing. The transcript from his deposition was admitted into evidence. In his deposition, MC1 said that everything he told the court at the temporary hearing had been truthful except that Levi told him to say that he saw a knife and a mirror at Londen's home.

When MC1 was questioned by the circuit court, MC1 admitted that he felt like he was "in a game of tug-of-war." He did admit that he had seen his mother on the floor crying out for medical attention and that he thought his mother had overdosed. However, he said he no longer believed that she attempted suicide because things were going better now.

Londen was recalled as a witness. She reiterated that there had never been any mental or physical abuse in her relationship with Adam. She explained that Adam did not know how to "handle where [she] was emotionally" and did not always care for her in the way he should have. She admitted that she had some "passive suicidal ideations" in the past but never put a plan into effect. Londen stated she intended to stay in therapy and claimed that she was able to "process and stop these problems before they blow up on [her]." She felt that she was mentally able to have her children back in her home.

At the conclusion of the hearing, the attorney ad litem stated that it was clear to him that both parties love their children and that the children seemed comfortable at both homes. He thought the situation had been very difficult on MC1. His recommendation was that "the parties should continue with joint custody" and that he felt that the children "should be returned to the primary physical custody of Mom." He also recommended that Londen and Adam attend couples counseling to work on their relationship. After hearing oral arguments from the parties, the circuit court found that Levi should be awarded custody of the children and allowed to relocate.

The circuit court filed a written order on August 22, 2023. In granting Levi custody, the circuit court made the following relevant findings:

> At the final hearing held on August 4, 2023, the Court expressed continued concern for the Plaintiff/Mother's mental health with severe and ongoing symptoms and issues from 2021 to the present time, instability in the Plaintiff/Mother's home based on the Plaintiff's relationship with her boyfriend and the domestic violence present in the home, and does not find the Plaintiff's testimony credible. Based on the testimony and evidence presented at the hearing including the testimony from the Plaintiff's mother and grandmother, the Court finds there has been a material

18

change in circumstances that warrants a change in custody, and it is in the best interest of the minor children that the Defendant/Father be awarded full custody on a permanent basis as he can provide an appropriate, wholesome, and stable environment for the minor children, is financially, physically, and emotionally able to care for the minor children, and has built a loving, stable, positive relationship with the minor children. The Defendant shall be allowed to relocate permanently to Owasso, Oklahoma with the minor children.

This appeal followed.

## II. *Standard of Review*

In reviewing child-custody cases, we consider the evidence de novo, but we will not reverse the circuit court's findings unless they are clearly erroneous or clearly against the preponderance of the evidence. *McNutt v. Yates*, 2013 Ark. 427, 430 S.W.3d 91. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been made. *Cooper v. Kalkwarf*, 2017 Ark. 331, 532 S.W.3d 58. It is well settled that the primary consideration is the welfare and best interest of the child, while other considerations are merely secondary. *McNutt, supra.* We give due deference to the superior position of the circuit court to evaluate and judge the credibility of the witnesses in child-custody cases, and this deference to the circuit court is even greater in cases involving child custody because a heavier burden is placed on the circuit court to utilize to the fullest extent its powers of perception in evaluating the witnesses, their testimony, and the best interest of the children. *Cooper, supra.* Further, the party seeking modification of a custody order has the burden of showing a material change in circumstances. *Jeffers v. Wibbing*, 2021 Ark. App. 239. Courts impose more stringent standards for modifications in custody than they do for initial determinations of custody to

promote stability and continuity in the life of the child and to discourage repeated litigation of the same issues. *Id.* In order to change custody, the circuit court must first determine that a material change of circumstances has occurred since the last order of custody, and if that threshold requirement is met, it must then determine who should have custody with the sole consideration being the best interest of the child. *Acklin v. Acklin*, 2017 Ark. App. 322, 521 S.W.3d 538. Londen challenges both requirements on appeal.

### III. *Material Change in Circumstances*

Londen first argues that the circuit court clearly erred by finding that a material change in circumstances had occurred since the divorce when the uncontroverted evidence showed that she had addressed her mental-health issues and the alleged instability in her home. She acknowledges that the issue is whether her mental-health issues were materially worse at the time of the final hearing than they were at the time of the divorce decree. She also appears to argue that any changes needed to have "negatively impacted the children" to constitute a material change. Although Londen acknowledges that she had experienced panic attacks in the fall of 2022, she argues she had "resolved any serious concerns with her mental health" by the time of the final hearing. She further argues that there was no evidence that she and Adam had experienced any conflicts or instability in their relationship since she attended therapy. Accordingly, she asks that we reverse the circuit court's material-change-in-circumstances finding. We disagree.

Contrary to Londen's argument, there is no requirement that the circuit court wait until the children are actually harmed before finding that a material change in circumstances

20

warranting a change in custody exists. *Rice v. Rice*, 2016 Ark. App. 575, 508 S.W.3d 80. Further, Londen's argument that we must reverse because the circuit court's findings amounted to an "unfounded medical diagnosis" by the circuit court is misplaced. Londen specifically cites the *dissent*—not the majority—in *Hicks v. Cook*, 103 Ark. App. 207, 288 S.W.3d 244 (2008), for support. Citing the deference we give to circuit courts, the majority in *Hicks* affirmed the circuit court's decision that did not believe depression and anxiety occurred overnight and that the child would be much better off if the mother took her medicine. The dissent criticized the majority's opinion and claimed that the circuit court was attempting to practice medicine without a license. *Id.* at 220, 288 S.W.3d at 253 (Hart, J., dissenting). Here, even if we were to consider the cautions discussed in the *Hicks* dissent, we still disagree that the circuit court's statement that Londen still suffered from "severe and ongoing symptoms" constituted an improper medical diagnosis given the testimony and evidence provided by Londen's therapist, Ms. Cantu.

We also disagree with Londen's argument that our decisions in *Bray v. Bray*, 2020 Ark. App. 111, 595 S.W.3d 72, and *Ellington v. Ellington*, 2019 Ark. App. 395, 587 S.W.3d 237, are determinative under the circumstance presented here. In *Bray*, this court agreed with the circuit court that there could be no material change when it believed appellee's testimony that any alleged instability had been resolved by the time of the final hearing. In *Ellington*, this court reversed a circuit court's decision that there was a material change when the record showed that, although the mother may have demonstrated some poor decision making in the children's living arrangements in the past, they had been remedied for over a

year and well before the final hearing. Here, the circuit court heard testimony about several incidents that occurred in 2022 that gave the circuit court concerns about Londen's mental health and stability in the home. Londen attempts to minimalize her mental-health issues and instability, instead claiming that the incidents that occurred in 2022 were isolated and that all issues have now been resolved, as was the case in both *Bray* and *Ellington*. However, on this record, we cannot say that the circuit court's decision was clearly erroneous.

Londen denied that Adam physically or mentally abused her and said she thought she was mentally stable and competent to take care of her children. However, unlike the court in *Bray*, the circuit court here did not find Londen's testimony credible. Further, the circuit court heard other evidence that Londen's mental-health issues and instability, while perhaps better, had not fully resolved as she claimed and therefore could still constitute a material change. Ms. Cantu specifically opined that Londen had a least three more months of treatment if she continued to make progress toward her goals. Ms. Cantu noted in her progress notes that one of Londen's goals was for Londen to "identify triggers for symptoms of anxiety and depression. Develop and implement coping/calming skills to reduce symptoms from 4 days a week to 1 day a week as evidenced by client report, family report, or therapist observation." Accordingly, even Londen's therapist did not contend that Londen's mental-health issues would be fully resolved in three months. Instead, Ms. Cantu testified that she was helping Londen to recognize the symptoms of her panic attacks to help her stop them and "prevent a large episode from happening." Further, Ms. Cantu admitted that Londen had not disclosed to her that she had told the police she was in an abusive

relationship with Adam; that Londen had told her that her relationship with Adam was in a "standstill" until after court; that Londen was not in couples counseling; and that Londen had not reported any active suicidal ideation to her. Ms. Cantu also acknowledged that even though Londen had not reported active suicidal ideation to her, that did not mean it has not occurred. She admitted the possibility that Londen just has not reported it and explained that every patient has the ability to lie to their therapist.

The circuit court also heard evidence that Londen had told police she and Adam were in an abusive relationship and that she was suicidal; yet it is undisputed that Londen was not in couples counseling at the time of the final hearing. Even though MC1 attempted to change his testimony at the final hearing after being in Londen's custody for the majority of the summer, MC1 had previously testified about his concerns regarding Londen's mental-health issues and the constant fighting in the home between Londen and Adam. Further, the circuit court also heard testimony from Londen's grandmother and mother that they had previously voiced concerns to Levi about Londen's mental health and relationship with Adam. On the basis of the above testimony and given our deference to the circuit court's assessment of the credibility of the witnesses, we cannot say that the circuit court clearly erred when it found a material change in circumstances on the basis of Londen's continued and still ongoing mental-health issues and instability. We therefore affirm the circuit court's findings regarding a material change in circumstances.

IV. *Best Interest*

23

Londen next argues that the circuit court clearly erred by finding that it was in the children's best interest to live with Levi without considering all the relevant factors in its best-interest analysis. She mainly asserts that the circuit court should not have considered the same factors that it considered in its material-change-of-circumstances findings; the circuit court failed to consider the importance of maintaining the children's relationship with their half sibling, MC3, or find an "exceptional circumstance" before allowing a change of custody; the circuit court failed to consider her ability to care for her children; and the circuit court improperly concluded that because Levi simply made more income than her, it was in the children's best interest to change custody. Again, Londen's arguments are misplaced.

We have recognized that unless exceptional circumstances are involved, young children should not be separated from each other by dividing their custody. *Starr v. Starr*, 2015 Ark. App. 110, 455 S.W.3d 372. However, this court has been critical of parties who use this rule as a substitute for a determination of what is in a child's best interest. *Id.* While one factor the court must consider in determining the best interest of the child is whether the child will be separated from siblings, the polestar in every child-custody case is the welfare of the individual child, and keeping siblings together cannot be the sole reason for a custody decision. *Id.*; *Madden v. Madden*, 2012 Ark. App. 582, 424 S.W.3d 360. Moreover, we have held that the prohibition against separating siblings in the absence of exceptional circumstances does not apply with equal force in cases where the children are half siblings, such as the case here. *Starr*, *supra*.

24

We have been clear that there is no exhaustive list of factors a circuit court *must* consider when analyzing the best interest of the child; the main consideration is whether there are changed conditions that demonstrate that a modification of the decree is in the best interest of the child. *Westin v. Hays*, 2017 Ark. App. 128, 513 S.W.3d 900. In *Bamburg*, we explained that the factors a circuit court *may* consider in determining what is in the best interest of the children include the psychological relationship between the parents and children, the need for stability and continuity in the relationship between parents and children, the past conduct of the parents toward the children, and the reasonable preference of the children. *Bamburg v. Bamburg*, 2014 Ark. App. 269, 435 S.W.3d 6. Although the order does not discuss every fact and factor the court took into account, there is a presumption that the court made the findings necessary to support its judgment. *Skinner v. Shaw*, 2020 Ark. App. 407, at 12, 609 S.W.3d 454, 461. Further, Londen is incorrect in her assertion that it is improper for a court to rely on the same facts it had previously set forth in its material-change-of-circumstances analysis in deciding best interest. *See Westin*, *supra*.

Here, the circuit court found that "it is in the best interest of the minor children that [Levi] be awarded full custody on a permanent basis as he can provide an appropriate, wholesome, and stable environment for the minor children, is financially, physically, and emotionally able to care for the minor children, and has built a loving, stable, positive relationship with the minor children." Contrary to Londen's assertion, the circuit court did not state that it was basing its decision to change custody on that fact that Levi has more financial resources than Londen. Rather, the circuit court merely referenced the fact that

Levi has the ability to provide a stable home for the children, which is permissible. *See Taylor v. Taylor*, 353 Ark. 69, 78, 110 S.W.3d 731, 736 (2003); *Sykes v. Warren*, 99 Ark. App. 210, 217, 258 S.W.3d 788, 793 (2007). Although Londen argues that the circuit court should have placed a greater weight on other factors she claims were in her favor, the court was not required to do so. Given our standard of review, the record, and the special deference we give circuit courts to evaluate the witnesses, their testimony, and the children's best interest, we cannot say that the circuit court clearly erred in finding that it was in the best interest of the children to change custody from Londen to Levi under these facts. Accordingly, we affirm.

Affirmed.

ABRAMSON and BROWN, JJ., agree.

*Taylor & Taylor Law Firm, P.A.*, by: *Tory H. Lewis*, *Andrew M. Taylor*, and *Tasha C. Taylor*, for appellant.

*Lisa-Marie Norris*, for appellee.